263 S.W.3d 368 (2008)
In the Interest of C.R., a Minor Child.
No. 05-07-00503-CV.
Court of Appeals of Texas, Dallas.
May 7, 2008.
*369 Angela Gholson D'Amore, Plano, for Appellant.
Cheryl Lee Vaughn, Melissa, Martin Michael Leyko, Alyson Marie Dietrich, Assistant District Attorney, John R. Rolater, Jr., Collin County District Attorney, McKinney, Trevor Woodruff, Austin, for Appellee.
Before Chief Justice THOMAS and Justices BRIDGES and FITZGERALD.

OPINION
Opinion by Chief Justice THOMAS.
Following a bench trial, the trial court terminated Ruby Davis's parental rights to C.R. On appeal, Davis challenges the trial court's judgment, contending the trial court erred in admitting Davis's drug test results and the evidence is legally and factually insufficient to support the trial court's termination order. We affirm.

Background
C.R. was born to Davis and Phillip Riddle on February 3, 1998. Both Riddle and Davis used "pseudoephedrine 60" or a "controlled substance" after C.R. was born. Davis obtained the drugs from Riddle, who owned a drug paraphernalia store.
In 2001, Davis and Riddle separated, and Davis and C.R. began living with Davis's mother in Royse City. Davis's mother is legally blind and has cancer. On March 9, 2006, Michelle Chanslor from the Texas Department of Family and Protective Services (the Department) responded to a complaint that Davis had left C.R. with his grandmother and C.R. was not being adequately supervised. Although C.R. was not removed from the home in response to the complaint, Chanslor requested that Davis take a drug test.
On March 28, 2006, the Department removed C.R. from Davis's home. Davis admitted she failed the drug test due to using methamphetamine and believed C.R. was removed because she failed the test. Following the removal, the trial court ordered Davis to participate in parenting classes, visit C.R. once per week, and undergo a psychological evaluation, counseling, a drug assessment, and random drug testing. Although the Department initially planned to return C.R. to Davis, it subsequently sought to terminate Davis's parental *370 rights.[1] After a bench trial, the trial court terminated Davis's parental rights under sections 161.001(1)(E) and (O) of the Texas Family Code and named the Department C.R.'s sole managing conservator. Davis appealed.

Admission of Drug Test Results
In her first point of error, Davis contends the trial court erred in admitting Davis's drug test results because the sponsoring witness was not qualified to give an expert opinion and the test results were not the business records of the lab that collected the test samples. The trial court's evidentiary rulings will not be overturned absent an abuse of discretion. Bay Area Healthcare Group, Ltd. v. McShane, 239 S.W.3d 231, 234 (Tex.2007) (per curiam). To be entitled to reversal due to the erroneous admission of evidence, an appellant must not only show the trial court erred in admitting the evidence, but that the error was reasonably calculated to cause and probably did cause the rendition of an improper verdict. TEX.R.APP. P. 44.1; McShane, 239 S.W.3d at 234. "We review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." McShane, 239 S.W.3d at 234.
The trial court admitted the drug test results for the limited purpose of establishing Davis's and the Department's states of mind. Accordingly, the evidence showed only that Davis and the Department were working on the premise Davis failed a drug test. The record does not reflect the trial court relied on the test results to establish Davis failed the test or was using illegal drugs. See Natural Gas Clearinghouse v. Midgard Energy Co., 113 S.W.3d 400, 410 (Tex.App.-Amarillo 2003, pet. denied) ("It is clear that when a dispute is tried to the court, as opposed to a jury, we presume that the trial judge disregarded inadmissible testimony, unless the record discloses otherwise.").
Further, there was extensive evidence of Davis's use of illegal drugs. Davis admitted she had used a "controlled substance" or pseudoephedrine 60 since 1994. She admitted to criminal charges in 1994 for which she received a "deferred" and that she was incarcerated in Oklahoma in 2001 due to the possession of a controlled substance. Davis admitted she failed a drug test due to using methamphetamine and believed C.R. was removed because she failed the test. In May 2006, Davis told Randel Rubenstein, a licensed chemical dependency counselor who performed a substance abuse evaluation of Davis, that she had used methamphetamine consistently, and sometimes heavily, for several years. Davis also failed to take seven of nine requested drug tests, allowing the trial court to infer the test results would be positive, In re J.T.G., 121 S.W.3d 117, 131 (Tex.App.-Fort Worth 2003, no pet.), and told Debra Pendergrass, a caseworker for the Department, that one of the requested tests would be positive. Finally, Davis invoked her rights under the Fifth Amendment to the United States Constitution when questioned about a friend who purchased drugs for Davis less than two months prior to the termination trial, again allowing the trial court to infer Davis continued to use illegal drugs after C.R. was removed. In re C.J.F., 134 S.W.3d 343, 352-53 (Tex.App.-Amarillo 2003, pet. denied) ("Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances."). Because the actual drug test results, even if considered by the trial court for the truth *371 of the matter, were cumulative of other evidence Davis used illegal drugs, any error by the trial court in admitting the results was harmless. Nissan Motor Co. Ltd. v. Armstrong, 145 S.W.3d 131, 144 (Tex.2004) ("Clearly, erroneous admission is harmless if it is merely cumulative."). We overrule Davis's first point of error.

Termination of Parental Rights
In points of error two through five, Davis contends the evidence is legally and factually insufficient to support the trial court's finding Davis's parental rights should be terminated and termination is in the best interest of C.R.

A. Standard of Review
A trial court may terminate the parent-child relationship if the fact finder finds by clear and convincing evidence (1) a parent committed one or more of the enumerated statutory acts in section 161.001(1) of the family code, and (2) termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001(1) (Vernon Supp.2007). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007 (Vernon 2002); see In re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). On appeal, we apply a standard of review that reflects this burden of proof. In re J.F.C., 96 S.W.3d at 264-66.
When reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the finding to determine whether the fact finder could reasonably have formed a firm belief or conviction the finding was true. In re J.L., 163 S.W.3d 79, 85 (Tex.2005); In re J.F.C., 96 S.W.3d at 266. In doing so, we assume the "fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so" and we "disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible." In re J.P.B., 180 S.W.3d 570, 573 (Tex.2005) (per curiam) (citing In re J.F.C., 96 S.W.3d at 266). However, we must also consider any undisputed evidence contrary to the finding in our analysis. In re J.F.C., 96 S.W.3d at 266.
In conducting a factual sufficiency review, we must give due consideration to any evidence the fact finder could reasonably have found to be clear and convincing. In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (citing In re C.H., 89 S.W.3d 17, 27 (Tex.2002)); In re J.F.C., 96 S.W.3d at 266. We consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. In re H.R.M., 209 S.W.3d at 108; In re J.F.C., 96 S.W.3d at 266. If the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. In re H.R.M., 209 S.W.3d at 108; In re J.F.C., 96 S.W.3d at 266.

B. Subsection 161.001(1)(E)
Under section 161.001(1)(E), a court may terminate the parent-child relationship if the court finds the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(E). This section refers only to the parent's conduct, as evidenced by the parent's acts or by the parent's failure to act. In re C.E.K., 214 S.W.3d 492, 496 (Tex.App.-Dallas 2006, no pet.). "Endanger" means to expose to loss or injury or to jeopardize. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987); In re C.E.K., 214 S.W.3d *372 at 496. Although "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," it is not necessary that the conduct be directed at the child or that the child actually suffer injury. Boyd, 727 S.W.2d at 533; In re C.E.K., 214 S.W.3d at 496.
Termination under section 161.001(1)(E) must be based on more than a single act or omission. In re J.T.G., 121 S.W.3d at 125. Rather, "a voluntary, deliberate, and conscious course of conduct by the parent is required." Id. However, the conduct does not have to occur in the child's presence. See Dir. of Dallas County Child Protective Servs. v. Bowling, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ). The use of illegal drugs by the parent may be considered endangering conduct that supports terminating parental rights. In re J.T.G., 121 S.W.3d at 125; In re U.P., 105 S.W.3d 222, 234 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).
Davis began using pseudoephedrine 60 or a "controlled substance" in 1994 and continued to use illegal drugs until fifty days before trial. She testified the substance she was using was "right there on the borderline of being legal and unlegal [sic] because they are sold in the stores and they are sold at head shops." However, she admitted she received a "deferred" in 1994 due to her possession of a controlled substance. She further admitted she was arrested in 2001 while driving in Oklahoma with C.R. in the car and was subsequently incarcerated for two months for possession of a controlled substance. She believed C.R. was removed because she failed a drug test and admitted she failed the drug test due to methamphetamine use. Further, she told Rubenstein in May 2006, that she had been using methamphetamine consistently, and sometimes heavily, for the last several years and she had not been drug-free for very long.
According to Rubenstein, if a person is not motivated to remain drug-free, there is less chance she will successfully recover. In Rubenstein's opinion, Davis was minimally motivated to remain alcohol and drug free. Although Davis appeared to understand the consequences of her drug use, she was still attempting to "hold onto" using drugs in her home. Davis told Rubenstein that it was not "anyone's business if I use drugs in the privacy of my own home because I'm not hurting anyone." Davis made similar statements to Pendergrass and Leo Norton, a Court Appointed Special Advocate volunteer.
Rubenstein recommended Davis participate in intensive outpatient treatment and Narcotics Anonymous (NA) meetings. According to Pendergrass, Davis went to an outpatient drug treatment program in Garland, but told Pendergrass it was too far from Davis's home. Davis told Pendergrass that she could get transportation to a program in McKinney. Pendergrass gave Davis information about a drug treatment program in McKinney, but Davis did not contact the program. Davis admitted she did not complete drug treatment through the courts but claimed she was never given a schedule for drug treatment. She testified she contacted Nexus, a drug treatment facility, but was not accepted for its inpatient program. Davis claimed "they" told her the outpatient program was two hours every day and "they" said she could not make that commitment due to transportation issues.
Shortly before trial, Davis was committed to a mental hospital for five days. After her discharge, she was referred to a mental health facility in Greenville where they asked her if she wanted to continue to take drugs. She indicated she would return to the facility but did not do so. *373 Although Davis did not participate in an inpatient treatment program, she attended some "drug rehab" classes in Plano that she described as "Alcoholic [sic] Anonymous." She attended these meetings three times and did not complete any of the steps.
Pendergrass asked Davis to take a drug test about once per month between June 2006 and February 2007. Even when offered a ride to the testing facility, Davis usually refused to go. Davis would also say she would go and then fail to do so. On one occasion, an employee from the testing facility was present at the Department's office, but Davis refused to take the test. Davis also indicated the results of one of the requested tests would be positive. Davis further claimed she did not have to take a test, citing to her "civil rights." Davis admitted she did not always take the requested drug tests and that she told Pendergrass one time that the test results would be positive. But she also testified she went to the testing facility to take a drug test and it was closed. Pendergrass, on the other hand, testified she told Davis that she needed to go directly to the testing facility from her visit with C.R. Pendergrass contacted the testing facility and told them a parent was on the way. The testing facility remained open but told Pendergrass that Davis never arrived at the facility. Davis failed to take seven of nine requested drug tests.
Davis indicated she was not concerned about Riddle being around C.R. when Riddle was under the influence of drugs. She also believed that whatever a person uses, she can take care of her child if she loves the child. She testified she knows she must make a choice and will not allow drug use to interfere with her parenting C.R. However, Pendergrass testified she told Davis that her drug use must be resolved before C.R. could go home, but Davis was not receptive to the idea drugs could hinder her ability to parent C.R.
A reasonable fact finder could have formed a firm belief or conviction that Davis's long history of using illegal drugs, minimal motivation to quit using drugs, continued use of drugs after C.R. was removed, and allowing C.R. to be around Riddle when Riddle was under the influence of drugs was a course of conduct that endangered the physical and emotional well-being of C.R. Applying the appropriate standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding Davis's parental rights should be terminated under section 161.001(1)(E).

C. Section 161.001(1)(O)
Under section 161.001(1)(O), a trial court may terminate a parent's parental rights if the parent failed to comply with a court order that specifically established the actions necessary for the parent to obtain the return of a child who has been in the conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under chapter 262 for the abuse or neglect of the child. TEX. FAM.CODE ANN. § 161.001(1)(O). Davis argues only that she substantially complied with the trial court's order and her lack of transportation prevented her from fully complying with the order.
The trial court ordered Davis to participate in parenting classes and undergo a psychological evaluation, counseling, a drug assessment, and random drug testing. Davis was also ordered to visit C.R. once per week. Davis attended all scheduled visits with C.R. and completed a drug evaluation with Rubenstein. However, Davis failed to comply with Rubenstein's recommendations that she attend NA and participate in an intensive outpatient program.
*374 Although there was initial confusion regarding the date for the psychological evaluation, Pendergrass gave Davis the name of the psychologist and heard Davis make an appointment. Davis subsequently claimed nobody was there for the appointment, she was not crazy, and she did not see the need for a psychological evaluation. While Davis claimed she received an evaluation during her hospitalization shortly before trial, she never provided that evaluation to the court.
Davis did not take seven of nine requested drug tests. Davis claimed her visits with C.R. occurred late in the afternoon and the testing facility was closed before she could arrive to take the test. However, Pendergrass testified on one occasion a technician from the testing facility was at the office where Davis visited C.R., but Davis declined to take the test. Pendergrass also testified she told Davis to go directly to the testing facility following Davis's visits with C.R. Pendergrass called the testing facility and told them a parent was on the way and the facility stayed open. The facility told her Davis never arrived. The trial court could reasonably infer Davis avoided taking the drug tests because she was using drugs. In re J.T.G., 121 S.W.3d at 131. Further, Davis indicated to Pendergrass on one occasion the test would be positive.
Pendergrass testified Davis initially had concerns about the fee for parenting classes. Pendergrass located a class for which the Department would pay; however, Davis had difficulty obtaining transportation to the classes. Pendergrass then made copies of the parenting workbook. She asked Davis to read a chapter each week and answer three questions the next week. Davis was unable to answer the questions without referring to the notebook. After three weeks, Davis indicated she did not want to do any more chapters. Pendergrass testified Davis did not complete the parenting class.
Davis contends transportation issues prevented her from complying with much of the trial court's order. However, Pendergrass testified she contacted C-CART in McKinney and C-CART would transport Davis to her appointments and return Davis to her home. Davis was required to schedule the transportation in advance and C-CART could not transport in Plano after 3:00 p.m. Therefore, Davis had to schedule her appointments before 3:00 p.m. Pendergrass testified Davis could use C-CART or an office aide for transportation to any appointment other than the parenting class and visitation with C.R. Further, Davis was able to obtain transportation to each visit with C.R., indicating she had resources when she chose to use them.
It is undisputed Davis failed to comply with the trial court's order specifying the actions Davis was required to take before C.R. could be returned. Rather, Davis argues transportation and scheduling difficulties excused her failure to fully comply with the order. However, section 161.001(1)(O) does not "make a provision for excuses" for Davis's failure to comply with the trial court's order. In re T.N.F., 205 S.W.3d 625, 631 (Tex.App.-Waco 2006, pet. denied). Further, the evidence was disputed regarding the extent of Davis's transportation and scheduling difficulties. Weighing the credibility of witnesses is within the sole province of the fact finder, and we may not balance competing evidence to substitute our judgment for that of the trial court. In re J.P.B., 180 S.W.3d at 573. Applying the appropriate standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding Davis's parental rights should be terminated under section 161.001(1)(O).
*375 The evidence is legally and factually sufficient to support the trial court's finding Davis's parental rights should be terminated. Accordingly, we overrule points of error two and three.

D. Best Interest
In points of error four and five, Davis asserts the evidence is legally and factually insufficient to support the trial court's finding that the termination of Davis's parental rights was in the best interest of C.R. Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM.CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. In re R.R., 209 S.W.3d 112, 116 (Tex.2006) (per curiam). The focus is on the best interest of the child, not the best interest of the parent. Dupree v. Tex. Dep't of Protective Servs., 907 S.W.2d 81, 86 (Tex.App.-Dallas 1995, no writ). However, parental rights may not be terminated merely because a child might be better off living elsewhere. In re D.M., 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.).
Section 263.307 of the family code sets out a number of factors that should be considered in determining whether a child's parent is willing and able to provide a safe environment. TEX. FAM.CODE ANN. § 263.307(b) (Vernon 2002); see In re R.R., 209 S.W.3d at 116 (citing section 263.307 factors in determining best interest of child in parental termination case). The listed factors that appear relevant to our review include the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills. TEX. FAM.CODE ANN. § 263.307(b). Further, the Texas Supreme Court has set out a list of nonexclusive factors relevant to a review of a finding on the best interest of a child, including the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the person seeking custody; programs available to assist those persons in promoting the best interest of the child; plans for the child by those individuals or by the agency seeking custody; the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate; and any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976). Some of the Holley factors overlap with the statutory considerations and with evidence supporting predicate grounds for termination. In re K.C., 219 S.W.3d 924, 928 (Tex.App.-Dallas 2007, no pet.).

1. Parental conduct, parental excuses, danger to C.R.
Davis admitted she and C.R.'s father had used a "controlled substance" since 1994. She admitted to a criminal record and incarceration for possession of a "controlled substance." She testified C.R. was removed because she failed a drug test and admitted she failed the test due to using methamphetamine. Davis told Rubenstein that she had used methamphetamine regularly, and sometimes heavily, for several years. After C.R. was removed, *376 Davis was ordered by the trial court to undergo random drug testing. Davis failed to take seven of nine requested tests and admitted on one occasion the test would be positive.
Although Davis admitted drug use had affected her life, she refused to admit it affected her ability to parent C.R. She believed she could care for her child, regardless of what drugs she was taking, so long as she loved C.R. She was not concerned about C.R. being around Riddle when Riddle was under the influence of drugs. She believed that whatever she did when C.R. was not around did not affect C.R.
Rubenstein, Pendergrass, and Norton testified Davis was resistant to giving up illegal drugs. Rubenstein testified Davis was minimally motivated to quit using drugs and, without sufficient motivation, it was doubtful she would stay drug-free. Although Pendergrass referred Davis to two outpatient treatment programs and Davis was offered assistance by the mental health facility in Greenville, Davis failed to enroll in a treatment program. Davis claimed to have attended three Alcoholics or Narcotics Anonymous meetings, but admitted she completed none of the steps. Even though Davis knew her drug problem had to be addressed before C.R. could come home, she continued to use illegal drugs until fifty days before the termination trial.
The fact finder could give "great weight" to the "significant factor" of Davis's history of drug abuse, In re K.C., 219 S.W.3d at 927, and properly conclude Davis would not maintain a drug-free environment for C.R.

2. Davis's plans, home stability, completion of services, parenting ability
Davis lives, and cares for, her mother in her mother's house. Her only source of income is her mother's disability check. Although Davis never mentioned to Norton any reason she could not maintain full-time employment, she also never expressed an interest in obtaining full-time employment. She indicated to Rubenstein she could not look for a job because she was trying to address other issues in her life. Davis did not testify as to her plans for housing and support if her mother should die.
Davis testified she is a good mother. However, she failed to complete the parenting classes ordered by the trial court. Further, she wanted to "hold on" to her right to use illegal drugs in her own home and was resistant to the idea using drugs would hinder her ability to parent C.R. Rubenstein testified that if Davis continued to take illegal drugs, she could not provide a safe environment for C.R. Both Norton and Pendergrass testified Davis could not provide a stable home for C.R. so long as Davis continues using drugs. Norton testified he had not seen a positive improvement in Davis's parenting abilities.

3. C.R.'s desires
C.R. did not testify. Davis testified C.R. did not seem happy during all the visits and wanted to come home. Norton testified C.R. did not want to attend visits with Davis and was happy and wanted to remain with his foster parents. C.R.'s foster mother testified C.R. does not want to visit Davis and does not ask about Davis or his grandmother. Further, C.R. exhibited anger issues after his visits with Davis and told his foster mother that he wanted to stay with the foster family.

4. C.R.'s needs
Davis testified she loved C.R. and visited him every week since he was removed by the Department. She believes she is a *377 good mother. She took care of C.R. and C.R. was never abused. C.R. was placed into special education classes for reading before he was removed from Davis.
Pendergrass testified C.R. needs stability, structure, security, and consistency and to live in a drug-free environment. Pendergrass testified Davis was resistant to the idea that her drug usage affected her ability to parent C.R. In Pendergrass's opinion, C.R.'s foster parents are currently meeting his needs and it is in C.R.'s best interest for Davis's parental rights to be terminated.
Norton testified C.R. needed consistency and stability. C.R. had no interests or goals when he entered foster care, however, he now talks about being a scientist, an astronaut, or a car designer. In Norton's opinion, it is in C.R.'s best interest to remain with his foster parents and for Davis's parental rights to be terminated.
C.R.'s foster mother testified that when C.R. entered foster care he always wanted more food and was concerned there was not enough. C.R. did not know his vowel sounds or his consonant blends. C.R.'s reading skills were very low, and he was in special education for reading. C.R. went to Saturday school for reading during the summer between the second and third grades and is seeing a private tutor to help his reading skills. On his last report card, C.R. received A's and B's. The foster parents want to adopt C.R. C.R.'s foster mother believes it is in his best interest to be with them.

5. The Department's plans, available assistance, proposed placement stability
The Department anticipates C.R.'s foster family will adopt him. C.R. is doing well in foster care, is improving in his school work, and has an improved self-image. Pendergrass testified it was in C.R.'s best interest to remain with his foster family.
Considering all relevant factors under the applicable standards, we conclude the evidence is legally and factually sufficient to support the trial court's finding that the termination of Davis's parental rights was in the best interest of C.R. Therefore, we overrule points of error four and five.

Access to C.R.
In her sixth point of error, Davis contends the trial court erred by failing to enter a judgment allowing Davis to have some access to C.R. without terminating Davis's parental rights. Davis did not raise this argument in her statement of points and, therefore, we are precluded from considering it on appeal. TEX. FAM. CODE ANN. § 263.405(i) (Vernon Supp. 2007); In re R.J.S., 219 S.W.3d 623, 626-27 (Tex.App.-Dallas 2007, pet. denied). We overrule Davis's sixth point of error.
We affirm the trial court's judgment.
NOTES
[1] Riddle voluntarily relinquished his parental rights.