**Affirmed and Opinion Filed September 15, 2017**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00383-CV

### IN THE INTEREST OF E.M., A CHILD

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 15-00929-X**

## MEMORANDUM OPINION

Before Justices Francis, Brown, and Schenck
Opinion by Justice Francis

Father appeals the trial court's order terminating his parental rights to his five-year-old daughter, E.M. In a single issue, Father asserts the evidence is legally and factually insufficient to support the finding that termination of his rights is in the child's best interest. We affirm.

The Texas Department of Family and Protective Services filed a petition to terminate the parental rights of Mother and Father to E.M. Following a bench trial, the trial court terminated both parents' rights. Only Father appealed. Accordingly, the facts below generally focus on Father.

Christine Fowler, the CPS caseworker assigned this case, testified E.M. was born April 6, 2011. Two years later, in April 2013, CPS received a referral that Mother was using drugs while caring for E.M. CPS opened an investigation and contacted Mother and Father. Both tested positive for drugs: Mother tested positive for methamphetamines and Father tested positive for amphetamines. The case was closed in June 2013 after both parents complied with Department

recommendations and signed a safety plan stating that Father would not leave E.M. unsupervised with Mother.

Seventeen months later, in October 2014, a relative reported both parents were using drugs around E.M. and moving around to different hotels. Despite the efforts of a special investigator, CPS could not locate E.M. or her parents, so a child safety alert was issued in January 2015. The alert remained in effect until E.M. was located seven months later after Mother was arrested for prostitution. When the police asked Mother about E.M.'s location, Mother claimed she was with the maternal grandfather. A welfare check was made, but the child was not at the location provided by Mother. E.M. was found two days later at an extended stay motel with "neighbors." E.M. was placed in foster care that day. The Department's first contact with Father was three days later.

Temporary orders issued naming the Department temporary managing conservator and the parents as joint temporary possessory conservators with supervised access to E.M. Both parents were given service plans. Father's plan required him to participate in parenting classes, a psychological evaluation, a drug/alcohol assessment, individual counseling, and random drug testing. Fowler testified Father completed parenting classes and the psychological evaluation. He did not, however, complete the other services. In particular, he failed to submit to random drug testing as requested by CPS, except for three tests in September and November 2015 and May 2016. The September test was "concerning." Fowler acknowledged the November and May tests were negative, although Father waited for three weeks to take the May test.

Also, while this case was pending, Father was arrested four times, twice on domestic violence charges involving Mother. In January 2016, Mother reported Father had choked her. Father was arrested and, in February, pleaded guilty to misdemeanor assault/family violence and was sentenced to ninety days in jail. That same month, Father was placed on deferred

adjudication probation for three years for an April 2013 state jail felony theft. In May 2016, Father was arrested at a parent-child visitation on probation violations. The following month, Father was adjudicated guilty and sentenced to 360 days in county jail. Also in June 2016, Dallas police began investigating Father for a second family violence incident. In that case, Mother alleged Father punched her in the face, causing an injury to her eye and knocking her unconscious. Police charged Father with aggravated assault/family violence. The case was pending at the time of this trial, and Father was in jail and had been for nearly a month.

Father's legal woes and transportation problems impacted his ability to visit E.M. He was late to several visits and missed several more. According to Fowler, Father saw E.M. once in January 2016, once in March, twice in April, four times in May, and twice in June. He had not seen E.M. since June at the time of trial in August 2016. Fowler acknowledged that when Father did visit with E.M., those visits were positive. She agreed E.M. was excited to see Father, she was "bonded" to him, had no "behavioral concerns," and Father was able to manage her, address her emotional needs, and respond to her in encouraging ways.

Fowler told the court she was never able to visit Father in his home because she did not know where he lived. She believed it was in E.M.'s best interest for Father's rights to be terminated based on "the dangerous environment, criminal activity and drug use" by both parents. When asked to identify the "danger" to E.M.'s "physical health" if left in Father's care, Fowler listed the drug use, domestic violence, criminal activity, and the instability of moving from motel to motel. Fowler said these factors also endanger E.M.'s emotional well-being.

Dr. Myrna Dartson, a licensed psychologist, performed an evaluation of Father. She met with him on June 14, 2016. As part of her evaluation, she obtained a history from Father and then conducted an IQ test, achievement test, a personality test, a parent and stress index, and sentence completion test. The process took three to three-and-a-half hours.

In her written report, she recommended E.M. remain in foster care indefinitely and said placement with either parent would be to the child's detriment and compromise her safety. She also recommended that Father participate in a batterer's intervention program and anger management counseling; participate in individual counseling to address family-relational concerns; and follow the service plan recommended to him by CPS.

According to Dartson, Father denied any history of substance abuse or domestic violence in any romantic relationship although she had evidence to the contrary. As for criminal history, he said he was charged with theft when he failed to complete auto repair work on someone's car in a timely manner. He did not disclose his domestic violence charges. Father was also convicted of indecency with a child several years earlier, but he explained a former girlfriend falsely accused him of exposing himself to her child. As a result of the domestic violence incidents with Mother and the indecency with a child conviction, Dartson said she was concerned about E.M. being in Father's care. As she explained, a child living in an environment of domestic violence can suffer lasting emotional effects and also take on "learned behavior." Sometimes, she said, a child can become violent or experience serious emotional distress as a result of the home environment. A child subject to such an environment can also become a victim of abuse.

Dartson also said Father had poor coping and problem-solving skills contributing to his difficulties with anger control. She believed he posed a threat to the safety of E.M. She said testing suggested Father seems to blame family members for his difficulties and he responds in a "defensive manner." According to Dartson, Father tends to be impulsive and reacts without considering the consequences of his actions. Such behavior, she said, puts a child at risk. Dartson did not believe it was in E.M.'s best interest to live in the home with Father because of the indecency with a child conviction and the history of domestic violence. Because of his

–4–

tendency toward aggression, she said he might physically harm E.M. Additionally, she was concerned about possible sexual abuse given his prior conviction. Dartson acknowledged her report did not reflect Father had a "drug issue." She also agreed she had no knowledge that Father had been involved in any type of sexually inappropriate behavior since his 1992 conviction for indecency with a child.

Tiffany Lindley, a licensed professional counselor, was E.M.'s therapist from November 2015 to July 2016. Lindley would see E.M. at her foster home. Lindley had twenty-eight sessions with E.M. and worked with her in play therapy, using therapeutic toys to engage E.M.

According to Lindley, E.M. recalled living in the hotel, seeing Mother do drugs, and being left with a neighbor when Mother would leave. She also talked about "when mommy and daddy would fight" and believed she was not with them because they fought.

When E.M. first began therapy, she was "timid" but "wanted attention at the same time." She was also having issues with nose bleeds, which Lindley attributed to anxiety. At some point, E.M.'s behavior became "more aggressive" with more "acting out" versus internalizing. For instance, she said E.M. would yell or hit one of her foster siblings or throw things. In one incident, she knocked over a grocery cart while her foster brother was in the cart. Instead of saying something to express herself, E.M. pushed the cart. Lindley said these actions often manifested after E.M. had visited with her parents or if the visitation was cancelled.

In February or March, E.M. began exhibiting "sexualized play." The foster mother reported incidents where E.M. inappropriately touched one of the little boys in the home. On one occasion, the foster mother caught E.M. directing a toddler to "something that was sexual in nature, like bending over or sitting in her lap." Sometimes the foster mother would sit in the hallway to make sure E.M. stayed in her room at night and out of the room of another child. The foster mother eventually put E.M. in another part of the house so she could monitor her, and

E.M. was ultimately moved to another foster home. Based on her education and experience with abused children, Lindley was concerned E.M.'s behavior suggested she had been exposed to oral sex or pornography.

Department supervisor Tim Shreve recommended Father's parental rights be terminated, citing his "pattern of conduct" both before and during CPS involvement, including criminal activity, drug usage, failure to cooperate with CPS services, and family violence. All these factors, he said, combined to create an unsafe environment for E.M. As Shreve explained, methamphetamine use by a parent leads to neglectful supervision, and family violence creates a "very disturbing hostile environment" for a child. In addition, both parents had been "in and out of jail" during the pendency of this case—Mother for prostitution and Father for family violence and theft—which creates supervision issues "if one parent is in jail and there is no one to adequately supervise the child." And, Shreve explained, Father was incarcerated and E.M. could not be placed with him.

Shreve told the court E.M. is doing well in her foster care placement. He said a home study was pending in New York on the maternal grandmother for placement. Alternatively, the Department had plans in place to proceed with adoption by the foster family.

After hearing the evidence, the trial court found clear and convincing evidence that Father committed conduct defined by subsections D, E, and O of section 161.001(b)(1) of the Texas Family Code and that termination would be in the child's best interest. Specifically, the trial court found Father (1) knowingly placed or allowed E.M. to remain in conditions or surroundings which endangered her physical or emotional well-being, (2) engaged in conduct or knowingly placed E.M. with persons who engaged in conduct that endangered her physical or emotional well-being, and (3) failed to comply with his service plan. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), & (O) (West 2014). The trial court concluded its findings were based

on evidence showing a pattern of domestic violence, drug abuse, and criminal conduct by Father. Father requested findings of fact and conclusions of law, which the trial court made. Father appealed.

In his sole issue, Father challenges the legal and factual sufficiency of the evidence only as to the best interest finding. He does not challenge the predicate grounds supporting termination—endangerment and failure to comply with a court order.

Before a trial court may order termination of parental rights, it must find by clear and convincing evidence that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Clear and convincing evidence means "the measure of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id*. § 101.007 (West 2014).

In reviewing the legal sufficiency of the evidence to support a finding that termination is in the child's best interest, we view the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id*. at 266. We do not, however, disregard undisputed evidence that does not support the finding. *Id*.

In reviewing the factual sufficiency, we must give due deference to the findings and should not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *In re J.F.C*, 96 S.W.3d at 266).

A strong presumption exists that the best interest of the child will be served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016). Several statutory factors relevant to this appeal should be taken into account in evaluating a parent's willingness and ability to provide the child with a safe environment, including the child's age and vulnerabilities; results of psychological evaluations of the parents; whether a history of abusive or assaultive conduct or substance abuse by the child's family exists; the willingness and ability of the child's family to complete counseling services and to cooperate with an agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills. *See id.* § 263.307(b).

In addition to these statutory factors, the courts look to the *Holley* factors, which include (1) the child's desires, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by those individuals, (7) the stability of the home, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and some overlap the statutory considerations. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re C.R.*, 263 S.W.3d 368, 371 (Tex. App.—Dallas 2008, no pet.). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship

endangered the safety of the child." *In re C.H.*, 89 S.W.3d at 27. Evidence that proves one or more statutory grounds for termination may constitute evidence illustrating termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 28.

In his brief, Father presents a two-paragraph argument to support his issue. He argues no factfinder could form a firm conviction or belief that termination of his rights was in E.M.'s best interest, given Fowler's testimony that E.M. was bonded to him, was excited to see him during their visits, and he was able to manage E.M. during these visits. Additionally, he asserts Dartson's three-hour evaluation, completed without observing a parent-child visit, cannot overcome the "strong presumption" that the parent-child relationship should be maintained. But Father's argument ignores all the other evidence in this case regarding best interest.

As found by the trial court, the evidence revealed a pattern of drug use, domestic violence, and criminal activity on Father's part, much of which occurred during the pendency of this case. Evidence showed Father tested positive for amphetamines in 2013 when the Department first investigated the family. At the time, E.M. was just two years old. A year later, a relative reported Mother and Father were doing drugs around E.M. and moving from hotel to hotel. The Department was unable to locate E.M. for several months because of the family's transient lifestyle. Once E.M. was located, she was placed in foster care. Among other things, Father was required to undergo random drug testing as part of his service plan, but he failed to comply with numerous requests. Of the three tests he did take, the results of one was "concerning." Although the other two tests were negative, he waited almost three weeks to take the May 2016 test. His delay could be explained by allegations in his probation records showing he tested positive for methamphetamine and amphetamine in April and May 2016.

In addition to drug use, E.M. had been exposed to domestic violence and, in counseling sessions, recalled her "mommy and daddy fighting." While this case was pending, Father was

arrested four times—twice for assaulting Mother. One of those assault cases was pending at the time of this trial. While this case was pending, Father did three stints in jail, one for six weeks. Father's incarcerations impacted his ability to attend his parent-child visitations and demonstrate poor decision-making on his part, which in turn, bring into question his future decision-making. In addition to his arrests during the pendency of this case, evidence showed he previously was convicted of indecency with a child for exposing himself to the child of a former girlfriend. E.M.'s therapist testified that during the course of therapy, E.M. began exhibiting "sexualized" behavior and was concerned that she may have been exposed to oral sex or pornography.

Apart from his criminal conduct, the evidence showed Father failed to complete his counseling services. He also lived a rather transient lifestyle, which was not conducive to a stable environment for a child. In October 2014, he was reportedly moving from hotel to hotel with Mother and E.M. A year later, he reportedly was living in Budget Suites. His caseworker testified she had never visited his home because she did not know where he lived.

Finally, Dartson conducted a psychological evaluation of Father and concluded placement with Father would be detrimental to E.M. and compromise her safety. Dartson believed Father had difficulty controlling his anger. His poor coping and problem-solving skills contributed to his anger problem. She was concerned that because of his tendency toward aggression, he might physically harm E.M. In addition, he is impulsive and reacts without considering the consequences of his actions, which Dartson said put E.M. at risk. Although Father criticizes Dartson's evaluation because they were together only three hours and Dartson did not witness any parent-child visit, the factfinder was entitled to weigh those factors in considering Dartson's testimony.

In sum, the evidence indicated Father used drugs, was in and out of jail during the pendency of this case, has anger issues, physically abused Mother, lived a lifestyle unconducive

to a stable home life, and failed to complete the services necessary to reunite with E.M. While the evidence showed Father did well with E.M. on the supervised visits he attended and E.M. was happy to see him, other evidence showed she was doing well in foster care placement and the Department had plans for her future.

Having reviewed the evidence under the appropriate standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights was in E.M.'s best interest. *See In re S.S.*, No. 04-17-00072-CV, 2017 WL 3044586, at \*4 (Tex. App.—San Antonio July 19, 2017, no pet.) (mem. op.) (concluding evidence that Father was "in and out of jail," has anger issues, and physically abused wife on numerous occasions was sufficient to support finding that termination in best interest of child). We conclude the evidence was legally and factually sufficient to support the trial court's best interest finding and overrule the sole issue.

We affirm the trial court's judgment.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

170383F.P05

–11–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF E.M., A CHILD

No. 05-17-00383-CV          V.

On Appeal from the 305th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 15-00929-X.
Opinion delivered by Justice Francis;
Justices Brown and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered September 15, 2017.