# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00455-CV

---

**D. W., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 314,246-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

D.W. (Mother) appeals from the trial court's order terminating her parental rights to her daughters Karen, born in August 2018, and Rose, born in February 2020.[1] The trial court found that termination was in the children's best interest and that Mother had failed to comply with a court order establishing the actions necessary for her to regain custody of the children and that her parental rights to another child had been terminated due to endangering conduct. *See* Tex. Fam. Code § 161.001(b)(1)(M), (O), (2). Mother challenges the court's findings of statutory grounds and of best interest. We affirm the trial court's decree of termination.

---

[1] For the children's privacy, we refer to them by pseudonyms. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Father's rights were also terminated, but he is not a party to this appeal.

# FACTUAL SUMMARY

Karen was removed from her parents care in December 2019, and when Rose was born testing positive for marijuana exposure, she was also placed in the Department's care. The final hearing was held on August 9, 2021, and neither parent appeared. Both parents' attorneys stated that they had informed their clients of the hearing, that both parents had "indicated that they were willing to execute voluntary affidavits of relinquishment regarding their rights to the child," that neither of them had yet done so, and that both parents were "currently located out of state." The Department introduced into evidence the trial court's October 24, 2018 order nunc pro tunc terminating Mother's parental rights to her four older children, finding as statutory grounds that Mother had placed the children in endangering conditions, engaged in endangering conduct, and constructively abandoned them, *see id.* § 161.001(b)(1)(D), (E), (N);[2] the Department's December 4, 2019 removal affidavit seeking conservatorship of Karen; its February 20, 2020 affidavit seeking conservatorship of Rose; two other removal affidavits related to older children; the records from the counselor with whom Mother and Father were supposed to have individual and family counseling; Mother's psychological evaluation; the family's service plan; the test results from Rose's meconium showing positive results for marijuana; and several of Mother's drug test results.

According to the Department's December 4, 2019 removal affidavit, Mother's rights to her four older children were terminated in March 2018 due to "continuous use of illegal drugs and failure to complete services through the Department." Karen was born in August 2018, and the Department received a referral alleging neglectful supervision in September 2018.

---

[2] The original termination order was signed on March 28, 2018. Father is the father to two of Mother's older children, and his parental rights to those children were terminated on the same grounds. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N).

2

The Department found that both parents had tested positive for marijuana, that Mother had smoked marijuana while pregnant with Karen, and that Father was aware of Mother's drug use. Karen was returned to the parents' care on a monitored basis in August 2019, and the Department dismissed its case on October 2, 2019. However, on October 22, 2019, the Department received another referral, this one alleging that the parents "were back on drugs and had been since July of 2019" and were using "pills, marijuana, and cocaine" and that Karen "was being left with a lot of people." A Department investigator met with the parents, who both initially denied using marijuana but then tested positive in instant drug tests. Both parents then admitted that they had started smoking marijuana because they "had been stressed." Mother, who was four months pregnant with Rose, admitted that she had smoked marijuana the day before and told the investigator that she "is wanting to give the child up for adoption." Throughout November 2019, both parents tested positive for marijuana multiple times, and in late November, Mother's hair follicle test was positive for methamphetamine:

> Mother initially stated that she has never used Methamphetamines. She then stated that in September around her birthday she received ecstasy pills from a friend and gave the pills to her friend Latoya Smith. [Mother] stated that later on she drunk out of Ms. Smith's cup and she became ill. [Mother] stated that Ms. Smith was also very paranoid and sick on the same evening.

The Department investigator averred that the parents "were offered and completed services in three previous conservatorship cases and continue to display the same inappropriate behaviors." The Department sought conservatorship because:

> The Department has concerns related to [Father's] and [Mother's] continued drug use while being primary caregivers to [Karen]. [Mother] is using Methamphetamine and Marijuana while knowing she is currently pregnant and

3

has not stopped. [Father's] anger issues places the child at risk of harm. [Father] and [Mother] admitted to using Marijuana within the same week of the Department closing their previous case.

In the February 20, 2020 affidavit related to Rose's removal, the Department investigator stated that when Mother gave birth, she tested negative for illicit substances.[3] However, the Department was concerned because both parents "continue to test positive or miss testing for illegal substance[s] during their open CPS case, resulting in [the parents'] visitation continuing to be supervised by the Department for an hour once a week." The investigator stated that between November 1, 2019, and February 3, 2020, Mother tested positive for marijuana eight times, tested positive for methamphetamine once, and missed seven tests. Father had a similar drug test history. In addition, "Both parents admitted to attempting to falsify the drug test results with the use of store bought body cleansing items [at] a permanency conference with the Department on February 13, 2020." The investigator believed that Rose "cannot be properly cared for and supervised by" the parents.

The therapist to whom the parents were referred for individual and family counseling stated that the parents were unsuccessfully discharged in June 2020 for failure to attend: "This therapist has negatively discharged these clients due to minimal to no positive therapeutic service. The clients have missed previous appt.'s and minimal participation." The parents "continue to miss drug tests, use drugs and make excuses for why they cannot drug test or attend sessions," and the counselor reported "[n]o progress with these clients. They both do not comprehend they need to remain sober to raise at least one child." Finally, the counselor said, "The clients do not understand that this is not a game and they have to comply with their

___

[3] The Department had not yet received Rose's positive meconium test results.

4

DFPS case plan," and, "There has been too many excuses from these clients. . . . At this point of their almost 2 yrs with CPS they [are] still not complying."

Mother's psychological evaluation recommended that she attend Narcotics Anonymous (NA) meetings; obtain an NA sponsor; engage in individual therapy; and, if she tested positive for drug use, "participate in an Intensive Outpatient substance abuse treatment Program." In her family service plan, Mother was required to provide a safe, appropriate home; keep the Department informed of her current address, phone number, and employment status; maintain regular contact with her caseworker; attend all court hearings or inform her attorney and caseworker why she cannot attend; pay child support; refrain from criminal activities; refrain from illegal drug use; submit to a drug and alcohol assessment and follow all recommendations; submit to weekly drug tests; engage in family counseling; engage in individual counseling; and complete a psychological evaluation and follow all recommendations. Mother's drug-test reports showed: positive results for marijuana on October 3, 2018, November 19 and 26, 2019, December 18 and 23, 2019, January 3, 17, and 23, 2020, and May 21, 2020; positive results for methamphetamine on November 19, 2019, and March 24, 2020; positive results for cocaine on October 3 and 12, 2018; and negative results on March 13, 2020.

Department caseworker Jocelyn Holdburg testified that she had been assigned to the case in May 2021, about three months before the final hearing. She explained that the Department took custody of Karen in December 2019 "due to the mom and dad using drugs" and that the Department took custody of Rose "[d]ue to the mother and father's drug use, and then [Rose] testing positive for marijuana at the time of birth." Holdburg testified that before Karen and Rose were removed, the parents "had a prior termination on grounds of D, E, N and O."

5

The Department prepared family service plans for the parents, and Holdburg said that Mother had completed a psychological evaluation, attended some therapy sessions, and tested negative for drug use seven times between May and October 2020. However, she had not told the Department where she was living before she left the state, had stopped paying child support for Karen "around January," had never paid child support for Rose, had been arrested in April, was discharged unsuccessfully from both individual and family therapy for nonattendance, and did not engage in outpatient rehabilitation as recommended by her psychological evaluation. Further, although Mother's last positive drug test was in May 2020, she had not taken any tests since October 2020, resulting in her visitations being stopped, and Holdburg testified that Mother had last seen the children sometime before April 2021 and had not sent letters, gifts, or birthday gifts to the children. In addition, when she was engaged in testing, Mother had missed numerous tests, tested positive for marijuana multiple times, and tested positive for methamphetamine twice, including November 2019, about three months before Rose was born.

Holdburg had not had any contact with Mother or Father since she was assigned to the case, although Mother had been in contact with the previous caseworker. Holdburg testified that Mother had not responded to Holdburg's attempted phone calls, saying, "I did not have a valid address for her, so the phone was the only way that I had of getting in contact." However, Holdburg admitted that she had not contacted Mother's attorneys to ask for an address or phone number and said that while the previous caseworker was assigned, "the mom had an address," and the caseworker "did a home visit between January and April." Holdburg referred Mother to another therapist as required at the last hearing by emailing Mother's attorney because "she hadn't had any contact with the mother" and "had no way of offering that to her."

Holdburg testified that the Department had notified multiple family members and fictive kin. One relative had expressed interest in being a placement for Rose, but Holdburg said that the Department had concerns, explaining that the relative "is an 18-year-old female who is just recently starting off on her own" and that earlier that relative "had denied wanting long-term placement and she's kind of been back and forth about it." Karen was living in the same foster home into which she had been placed upon her removal in December 2019, and Holdburg testified that the placement was stable and meeting her emotional and physical needs and that the Department did not have any concerns about the home. Rose was placed initially with fictive kin recommended by the parents but removed when that person tested positive for drugs and placed in the foster home where she remained through the final hearing. Holdburg testified that the foster home was meeting Rose's needs and that the Department had no concerns about the placement. Both foster families wanted to adopt the children, and Holdburg testified that termination of Mother's parental rights was in the children's best interest.

Asked by the trial court for her opinion, the children's guardian ad litem said:

> The parents have struggled with drug abuse and being able to maintain a stable and safe environment for the—for either child. I do believe it is in the children's best interest that they continue the placements they're at, and that they work towards adoption and some finality. These children are young and they deserve a fresh start.

The guardian ad litem agreed with Holdburg that the current placements were safe and loving homes, saying, "Absolutely, your Honor. I have been to both homes, I have been to daycares. The children are doing great and thriving in their current placement[s]." She believed the two homes will be the children's "forever homes" and recommended termination of the parents' rights so that the children could be adopted by their foster families.

7

At the conclusion of the hearing, Mother's attorney acknowledged, "It's not great that [Mother] is not here. And, you know, frankly, the track record, I can't get around that, except that, you know, she has had decent contact with me. And, otherwise, she hasn't had decent contact with the department. But the service plan says what it says." He encouraged the trial court, if it was "inclined to terminate under M and O," to consider the family member who had expressed interest in being a placement. The trial court then found that Mother's parental rights "should be terminated based on O and M grounds" and that termination was in both children's best interest, signing a termination decree to that effect.

## DISCUSSION

Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings of statutory grounds and best interest. As to the (M) grounds, she argues that the Department did not establish that the 2018 termination decree was final and had not been "deleted," reversed, or set aside. As to the (O) grounds, Mother argues that she substantially complied with the parts of the plan from which she was not excused from complying.

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and

assume the factfinder resolved disputed facts in favor of its finding. *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). In reviewing factual sufficiency, we weigh the evidence favoring the finding against disputed evidence and ask whether the evidence "a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We defer to the decisions of the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

*Statutory Grounds*

Mother asserts that she should be viewed as having sufficiently met the following requirements from her service plan: provide a safe, appropriate home; show an ability to meet the children's needs; attend all court hearings; pay child support; abstain from criminal behavior; submit to a psychological evaluation, a psychiatric evaluation, and a drug and alcohol assessment and follow all recommendations; submit to random drug tests; and abstain from illegal drug use.[4] There is some evidence in the record that Mother sufficiently showed her parenting abilities through appropriate visitations[5] and that she submitted to a psychological evaluation, a

___

[4] As evidentiary support, Mother largely cites to the Department's final permanency report, filed on March 26, 2021. However, that report was not introduced into evidence, and the trial court thus could not have taken judicial notice of the truth of factual allegations contained in the report. *See C.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00229-CV, 2017 WL 3471072, at *3 (Tex. App.—Austin Aug. 9, 2017, no pet.) (mem. op.) (trial court may take judicial notice of earlier orders or findings of fact but not of truth of allegations contained in records). In the interest of justice, we will consider the report in our review.

[5] We note, however, that because of her repeated failures to take drug tests, Mother's visitation with her children had been abated, meaning she had not seen the children in at least five months at the time of trial.

psychiatric evaluation, and a drug-and-alcohol evaluation.  However, we disagree that the record,

including the final report, supports a conclusion that she met the other service-plan requirements:

- **Provide Safe & Appropriate Housing:**  The final report states that the parents were living together in a residence that was safe and appropriate but that "[i]t has recently been reported that it is unclear whether the parents continue to reside in the home the Department has previously viewed.  Verification is pending." Mother contends that despite the Department's concerns about whether she and Father were still living in the screened home, she should be considered to have met that requirement because her new caseworker, assigned in May 2021, "never made contact with Mother or went to her home."  However, Mother had apparently left the state, had not provided Holdburg with current contact information, and had not responded when Holdburg tried to contact her. Although Holdburg could have made additional efforts to find Mother, the service plan required Mother to maintain regular contact and to inform the Department of any change of address.  We thus disagree with Mother's assertion that she should be viewed as having fully satisfied the housing requirement set out in the service plan.

- **Attend Court Hearings:**  The report stated that Mother had attended all court hearings. However, Mother then failed to appear for the final hearing in August, despite being notified of it by her attorney.  We cannot disregard the fact that the final hearing is perhaps the most important hearing in a termination proceeding and thus conclude that Mother did not fully comply with this requirement.

- **Pay Child Support:**  Mother was required to pay $100 a month to each child's caregiver. The final report stated that she had made no payments to Rose's caregiver, had paid Karen's caregiver a total of $40, and was in arrears about $1,460 for Karen and $700 for Rose.  Mother argues that she should be considered to have "partially complied with this requirement," but we disagree.  Mother paid $40 out of about $2,300 that was required, and Holdburg also testified that Mother had not sent cards, letters, or gifts to the children. The Department showed that Mother did not comply with her child-support requirement.

- **Abstain from Criminal Behavior:**  The final report states that as of March 2021, Mother had complied with this requirement, but Holdburg testified that Mother had been arrested the month after the report was prepared.  The record does not include any evidence about what Mother was arrested for or what the status was of any charges, and we thus conclude that the Department did not show by clear and convincing evidence that Mother had been arrested for criminal behavior.  However, as noted below, the record does establish that Mother engaged in illegal drug use during the case.

- **Submit to Drug Tests & Abstain from Drug Use:**  Mother asserts that she complied with these requirements because she took twenty-eight tests throughout the case; only ten were positive, all of which were during the first six months of the case; and the seven tests she took after May 21, 2020, were negative.  However, the final report lists seventy-four tests: Mother tested positive eight times for marijuana between October 24, 2019,

10

and May 21, 2020; tested positive for methamphetamine in November 2019 and March 2020 (also testing positive for amphetamine); had one "Positive; Dilute Sample" result in March 2020; and missed a total of forty-seven tests, thirty-five after her last positive test in May 2020. It is true that Mother had seven negative tests starting in late May 2020, but the thirty-five missed tests can be presumed positive. *See, e.g., J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 WL 5456653, at \*6 (Tex. App.—Austin Nov. 17, 2021, no pet. h.) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.). We thus disagree that Mother should be considered to have complied with the requirements that she take drug tests and refrain from using illegal drugs.

- **Following Evaluation Recommendations:** Although Mother did submit to a psychological evaluation, a psychiatric evaluation, and a drug-and-alcohol assessment, she was also ordered to follow all recommendations provided by those assessments. However, Mother was referred to outpatient rehabilitation treatment by both her drug-and-alcohol assessment and her psychological evaluation, and Holdburg testified that Mother had not engaged in that service. Mother thus did not comply with an important element of the requirements related to the various assessments.

- **Engage in Family and Individual Therapy:** Mother argues that she should be excused from the requirements that she engage in family and individual counseling because the Department did not provide her with new referrals after she was discharged by her therapists. Mother seems to be invoking the defense provided by section 161.001(d), which disallows termination under subsection (O) if the parent proves by a preponderance of evidence that she was unable to comply with a provision of a court order, that she made a good-faith effort to comply, and that her failure to comply "is not attributable to any fault of the parent." Tex. Fam. Code § 161.001(d). We disagree. The final report states that Mother was discharged after six months of individual therapy due to repeated "no shows" and that the therapist thought Mother was "choos[ing] herself and drug use over her children." The same therapist attempted unsuccessfully to provide family therapy, discharging the parents for failure to attend and "minimal to no positive therapeutic service." The therapist observed in her notes that the parents "continue to miss drug tests, use drugs and make excuses for why they cannot drug test or attend sessions," and believed that the parents were not taking their service plans seriously, did not understand the need for sobriety, had made "too many excuses," and after almost two years of Department involvement were "still not complying." Mother was referred to a second individual therapist but was again discharged unsuccessfully "due to non-compliance." A new referral was requested at the December hearing, and although Mother notes that Holdburg did not advise Mother herself of the new referral, Holdburg testified that she had sent the referral to Mother's attorney but could not also provide it directly to Mother because Mother had not provided her current contact information. Mother did not show by a preponderance of the evidence that she made a good-faith effort to comply or that her non-compliance was not her fault, *see id.*, and we thus conclude that Mother did not comply with her therapy recommendations.

11

Even considering the statements included in the Department's final report and allowing for "substantial" compliance with a court order,[6] the trial court could have formed a firm conviction or belief that Mother failed to comply with requirements placed upon her by a court order. *See id*. § 161.001(b)(1)(O). We hold that the evidence is both legally and factually sufficient to support the trial court's finding under subsection (O).[7] We overrule Mother's first issue on appeal.

*Best Interest*

In her second issue, Mother challenges the trial court's best-interest finding, insisting that the evidence "was either conclusory or contradictory" and that the court thus could not have formed a firm belief of conviction that termination was in the children's best interest.

---

[6] Although the family code does not provide for "substantial compliance" with service plan, *see, e.g.*, *In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied), we have held that "partial or substantial compliance with a court-ordered family-service plan does not establish non-compliance as a matter of law." *M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258, at *10 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.) (citing *In re S.M.R.*, 434 S.W.3d 576, 584 (Tex. 2014)). Instead, "whether a parent has done enough under the family-service plan to avoid termination under subsection (O) is ordinarily a fact question and decided on a case-by-case basis." *Id*.; *see S.M.R.*, 434 S.W.3d at 584 (disagreeing with Department's argument "accept[ing] nothing less" than "strict compliance" with service plan and stating that "whether a parent has done enough under the family-service plan to defeat termination under subpart (O) is ordinarily a fact question").

[7] Because the Department provided clear and convincing evidence supporting a finding of statutory grounds under subsection (O), we need not consider Mother's argument related to subsection (M), citing *In re P.W.*, 579 S.W.3d 713, 722-23 (Tex. App.—Houston [14th Dist.] 2019, no pet.), for the proposition that the Department was required to prove both an earlier termination of her parental rights under subsections (D) or (E) and that the prior decree had not been reversed, vacated, or modified. *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.) ("Having determined that the evidence is sufficient to support the jury's finding on one of the statutory grounds, we need not consider whether the evidence would support other grounds for termination.").

We review a trial court's finding of best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given her age; her emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the homes; parental conduct indicating that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

Although the evidence related to best interest is less developed than would be ideal, Holdburg testified about Mother's behavior before and after the children were removed, explaining that Mother had lost custody of her older children shortly before the current case began, that her and Father's drug use caused Karen to be removed, and that Mother tested positive for methamphetamine about three months before Rose was born. She continued to use drugs throughout at least the first half of the case, and then missed the vast majority of drug tests after May 2020. Because of her failure to test, Mother had not seen the children in at least five months, and she had not attempted to send the children letters or gifts in that time. Because she had not informed the Department where she was living, there was no evidence about whether her living situation would be appropriate for young children. Of grave concern, she had not engaged in counseling or drug rehabilitation to address the concerns raised in her various evaluations.

Finally, Mother did not appear for the final hearing and thus provided no information about her plans for the children.

The record shows that the children were both placed in loving, stable homes where they were "thriving." Karen had been in the same home since her removal when she was about eighteen months old, and Rose had been placed in her current home since she was eight months old, when she was moved from the initial placement recommended by the parents due to that person's drug use. The children's guardian ad litem had visited the foster homes and day care to be sure the children were in safe and loving placements. Both foster families hoped to adopt the children, and Holdburg and the guardian ad litem agreed that termination and adoption was in the children's best interest, with the guardian ad litem saying the children deserved "finality" and a "fresh start."

The children had lived in their foster homes for a majority of their young lives, and the placements are safe and stable and hope to adopt the children. Mother has a history of drug use leading to the removal of her children, she tested positive for methamphetamine while pregnant with Rose, she continued to use drugs throughout the proceeding, and she repeatedly chose not to take drug tests at the expense of visitation and contact with her children. She did not stay in contact with her new caseworker, as required under her service plan. Mother did not engage in therapy, which her psychological and psychiatric evaluations strongly recommended, nor did she avail herself of drug treatment programs or NA, as recommended. Given the evidence of inappropriate behavior by Mother, a lack of excuses for that behavior, the danger posed to the children by Mother's apparent ongoing and untreated drug use, and her failure to engage with the Department to improve her parenting abilities and stability, we cannot conclude that the trial court lacked sufficient evidence on which to decide that termination of Mother's

14

parental rights is in the children's best interest. *See Holley*, 544 S.W.2d at 371-72. We overrule Mother's second issue on appeal.

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's termination decree.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   January 6, 2022