**AFFIRM; and Opinion Filed November 27, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-18-00849-CV
_____

## IN THE INTEREST OF K.D., A CHILD

**On Appeal from the 354th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 84,309**

# MEMORANDUM OPINION

Before Justices Lang-Miers, Evans, and Schenck
Opinion by Justice Lang-Miers

Mother appeals the trial court's judgment terminating her parental rights to her daughter K.D. Mother argues that the evidence is legally and factually insufficient to support the jury's finding that the parent-child relationship between Mother and K.D. should be terminated. We affirm the trial court's judgment.

### BACKGROUND

K.D., aged two, twice left home without supervision and was found walking down the road by herself. After the second incident, law enforcement officers found Mother at home asleep in the middle of the afternoon. Mother consented to a drug test on that day, and tested positive for methamphetamine and amphetamine. The Department of Family and Protective Services ("Department") received a referral of neglect and conducted an investigation. K.D. was removed from the home. The Department filed a petition for K.D.'s protection and conservatorship and for

termination of Mother's parental rights. The Department was appointed managing conservator of K.D. in March 2017.

K.D. went to live with Mother's Father L.D. ("Grandfather") and his wife N.D. ("Step-Grandmother") until November 2017, when K.D. was placed with Step-Grandmother's daughter J.W. ("Foster Mother") and her family. K.D. was living with Foster Mother at the time of trial in June 2018.

In the year after K.D. was removed from Mother's care, Mother had many difficulties with her living arrangements. Among other problems, two different places where Mother was living caught fire, and all of Mother's possessions were destroyed. But four months before trial, Mother moved into a duplex in Sherman. Mother contends this home was suitable for K.D.'s return. Mother also contends that at the time of trial, she had a stable income, and she remained in good standing through her probation, including negative drug tests. Although Mother did receive negative results on drug testing conducted through urinalysis, Mother also admitted that hair follicle testing was positive for increasing amounts of methamphetamine throughout the year after K.D.'s removal from Mother's care. Mother explained the hair follicle test results by testifying that her hair has not grown since she was in the third grade, and stress caused the rising test levels. Mother contends the Department refused to make reasonable efforts to give her long-term drug testing that would account for these issues. Mother denies using methamphetamine after she attended an outpatient substance abuse treatment program in the summer of 2017.

In March 2017, the court made temporary orders. The orders included drug and alcohol testing and assessments, participation in an in- or outpatient program, obtaining psychological and psychiatric assessments, taking a parenting class, and other requirements. Mother was also ordered to obtain domestic violence situation counseling. Mother explained that K.D.'s father was abusive to her "one time." Mother admitted that she did not obtain the domestic violence counseling

because it slipped her mind. Mother testified that she complied with the court's other orders when she had transportation to do so, but much of the supporting paperwork had been destroyed in one of the fires. Mother conceded that although the court had ordered her to "participate in NA/AA or Celebrate Recovery three (3) hours per week and provide proof of attendance once a month to the department, until further notice of the court," she never provided proof of attendance. She testified that she "went as often as I could" but "could only go twice a week sometimes" and "always forgot" to bring her proof of attendance forms when she came to court in the months before the fires.

The case proceeded to trial before a jury. Mother, Grandfather, a Court Appointed Special Advocate ("CASA") volunteer, a CASA supervisor, Foster Mother, and a friend of Mother's testified. Mother testified about the incidents of K.D. leaving the house by herself. She admitted that she and K.D. were living in someone else's home at the time, and she relied on the homeowner to watch K.D. even though he used methamphetamine.

Grandfather testified about Mother's drug use, inability to hold a job, poor choices in relationships and living situations, and "long history of instability." Mother lived with Grandfather "off and on," "several times," including periods of time before and after K.D.'s birth, and Grandfather attempted to help Mother by providing transportation, caring for K.D., and other assistance while undergoing his own treatment for stage four cancer. Mother, however, wrote to Grandfather complaining of her struggles in finding employment, transportation, and a place to live, stating that "[n]one of this would be like this if you had been the Dad I needed you to be." She accused Grandfather of being selfish, of "not being there for me like you should have been," and of needing to "Man Up" and help her.

Initially, K.D. was placed with Grandfather and Step-Grandmother after her removal from Mother's care. Grandfather testified that K.D. initially was "very quiet, withdrawn" when she first

came to live with them, and "was terrified at night." When Grandfather's health declined, K.D. was placed with Foster Mother and her family. Grandfather testified that in his home and subsequently in Foster Mother's home, K.D. "has just blossomed," singing in church, taking gymnastics, and "doing everything."

In her testimony, Mother explained that her employment in the summers of 2016 and 2017 consisted of renting out two or three bounce houses for birthday parties. She made payments on the bounce houses from the rental fees she received. Grandfather loaned her a vehicle to transport the bounce houses to events. But the bounce houses were destroyed in February 2018 by a fire at the friends' home where Mother was living.

At the time of trial, Mother was employed part-time "doing make-readies for apartments," earning $10 per hour and working 20 to 25 hours per week. Mother's rent of $750 per month was being paid by her aunt ("Aunt"). Aunt agreed to pay Mother's rent for six months, three or four of which had elapsed at the time of trial. Aunt also gave Mother a car, but it had broken down by the time of trial. Mother bought another car for $175 that she used to attend trial. Mother testified that she was planning to get a full-time job at some point in the future, but was "just trying to get through the next two days" of the trial.

The jury found that the parent-child relationship between Mother and K.D. should be terminated. On July 11, 2018, the trial court rendered an order of termination that incorporated the jury's finding. The trial court found by clear and convincing evidence that termination of the parent-child relationship between Mother and K.D. was in K.D.'s best interest. The trial court also found four statutory grounds for termination by clear and convincing evidence. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P). The trial court appointed the Department as K.D.'s permanent managing conservator. This appeal followed.

STANDARD OF REVIEW

Because the natural right between a parent and her child is one of constitutional dimensions, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In parental termination cases, due process requires application of the clear and convincing standard of proof. *Id.* The family code defines clear and convincing as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

On appeal, we apply a standard of review that reflects the elevated burden of proof at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014) (factual sufficiency); *In re J.F.C.*, 96 S.W.3d 256, 264–66 (Tex. 2002) (legal sufficiency). When the legal sufficiency of the evidence is challenged in a case involving the termination of parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could form a firm belief or conviction that its finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d at 266). Giving deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id*. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*. This does not mean that a court must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *Id*.

When conducting a factual sufficiency review of a decree terminating parental rights, we give "due deference" to the factfinder's findings and do not supplant the factfinder's judgment with our own. *In re A.B.*, 437 S.W.3d at 503; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per

curiam). We determine whether, on the entire record, "the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re A.B.*, 437 S.W.3d at 502 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). We must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. "'If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.'" *In re A.B.*, 437 S.W.3d at 503 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

### TERMINATION OF PARENTAL RIGHTS

A trial court may terminate the parent-child relationship if the factfinder determines (1) a parent committed one or more of the enumerated statutory acts in section 161.001(b)(1) of the family code, and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

*Statutory Grounds*

In this case, the trial court found that Mother knowingly placed or knowingly allowed K.D. to remain in conditions or surroundings which endangered K.D.'s physical or emotional well-being, TEX. FAM. CODE ANN. § 161.001(b)(1)(D); engaged in conduct or knowingly placed K.D. with persons who engaged in conduct which endangered K.D.'s physical or emotional well-being, TEX. FAM. CODE ANN. § 161.001(b)(1)E); failed to comply with the provisions of a court order that specifically established the actions necessary for Mother "to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse

or neglect of the child," TEX. FAM. CODE ANN. § 161.001(b)(1)(O); and "used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and: (i) failed to complete a court-ordered substance abuse treatment program; or (ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance," TEX. FAM. CODE ANN. § 161.001(b)(1)(P).

*Best Interest*

A judicial determination of the "best interest" of a child is "not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re K.L.M.*, No. 05–16–01098–CV, 2017 WL 836850, at *5 (Tex. App.—Dallas Mar. 3, 2017, no pet.) (mem. op.). "Rather, 'best interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id*. In reviewing a factfinder's best-interest finding, we consider several nonexclusive factors, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (in reviewing a best-interest finding, appellate court "consider[s], among other evidence, the *Holley* factors"). While there is a strong presumption that a child's best interest is served by maintaining the parent-child relationship, the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *In re D.W.*, 445 S.W.3d at 925.

The *Holley* factors focus on the best interest of the child, not the best interest of the parent, and are not exhaustive. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ); *In re C.H.*, 89 S.W.3d at 27. Some of the listed factors may be inapplicable to a case and other factors not on the list may also be considered when appropriate. *See In re C.H.*, 89 S.W.3d at 27. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *D.M. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00137-CV, 2017 WL 2628949, at *4 (Tex. App.—Austin June 13, 2017, no pet.) (mem. op.). On the other hand, the presence of scant evidence relevant to each factor will generally not support such a finding. *In re C.H.*, 89 S.W.3d at 27. Evidence of one of the predicate acts for termination under section 161.001(b)(1) of the family code may also be relevant to determining the best interest of the child. *Id.* at 28.

## ANALYSIS

In support of her contention that the evidence was legally and factually insufficient to support the jury's finding that the parent-child relationship should be terminated, Mother argues the evidence shows she has maintained sobriety and improved her financial and residential stability. She contends the Department ignored her "consistent clean" urine tests, relying instead on hair follicle tests that were taken several months before trial. Mother testified that she has been drug free since January 3, 2017, and has completed the substance abuse outpatient program. In sum, Mother relies on evidence of her improved conduct since K.D.'s removal from her care.[1]

More specifically, Mother argues:

- The testimony of the CASA volunteer and supervisor was conclusory and did not amount to more than a scintilla of evidence;

---

[1] Mother does not specifically challenge the trial court's findings under family code section 161.001(b)(1), and we conclude, for the reasons we discuss, that there was clear and convincing evidence to support the findings regarding endangerment, failure to comply with court orders, and use of a controlled substance. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P); *In re D.W.*, 445 S.W.3d at 925 (same evidence can be relevant to both 161.001(b)(1) termination grounds and best interest under *Holley*). For example, there was evidence that Mother tested positive for methamphetamine when K.D. was found walking down the street alone, and again tested positive for methamphetamine in a hair follicle test after she had completed a court-ordered substance abuse program, establishing a violation of subsection (P) of section 161.001(b)(1).

- Mother offered evidence of her bond with K.D. in a video played for the jury;

- Foster Mother testified only that she would give K.D. the same opportunities as her older children, and did not address how she would meet K.D.'s emotional and physical needs now and in the future;

- There was no evidence that K.D. would be in any danger in the future in Mother's custody, or if Mother maintained rights as a possessory conservator;

- Mother demonstrated improvement in her ability to care for K.D. by moving to a more stable home, maintaining employment, and completing a parenting course;

- Mother has obtained assistance from Aunt and completed a drug rehabilitation program;

- Mother plans to maintain her sobriety;

- Mother has a stable home;

- Because the Department's only evidence is from the time of K.D.'s initial removal from Mother's care, there is no current evidence of acts and omissions indicating the parent-child relationship is not a proper one;

- The Department did not test Mother for drug use consistently through the case, and Mother proved through her testimony and clean urine tests that she has maintained sobriety since January 3, 2017;

- It is not enough that K.D. might be better off living elsewhere, especially given Mother's recent improvements to her life, and Mother's behavior was "not egregious enough, on its own, to warrant a finding that termination is in [K.D.'s] best interest."

We discuss Mother's contentions in our review of the *Holley* factors.

### *Desires of the child*

Tricia Dempsey, an advocate supervisor for CASA, has visited K.D. in her placement with Foster Mother and her family, but testified that K.D. was not "developmentally ready" to discuss staying in Foster Mother's home permanently or long-term. *See In re D.W.*, 445 S.W.3d at 926 (child's preference should not be considered absent showing of sufficient maturity). As discussed below, witnesses testified to K.D.'s attachment to her foster family, and Grandfather testified that K.D. has "just blossomed" under Foster Mother's care.

Mother played a video for the jury that she relied on to show her bond with K.D. But she also admitted that because she failed drug tests, her visits with K.D. ceased in May 2017. And evidence that a child loves a parent and enjoys visits is only marginally relevant to a best interest finding. *Id.* Based on the record before us, we conclude this factor is neutral, weighing neither in favor of nor against termination of Mother's parental rights. *See In re A.G.*, No. 05-15-01298-CV, 2016 WL 3225894, at *6 (Tex. App.—Dallas June 10, 2016, pet. denied) (mem. op.).

***Child's current and future emotional and physical needs***
***Parenting ability and plans for child of those seeking custody***
***Stability of home or proposed placement***

Dempsey testified about K.D.'s placement with Foster Mother and her family. We disagree with Mother that Dempsey's testimony was conclusory. Dempsey visited Foster Mother's home three times after K.D. was placed there, testified about her observations, and explained to the jury that in addition to her training and experience at CASA, she is a certified teacher for pre-K through sixth grade in regular education, and for all ages in special education. Dempsey met with Foster Mother, visited K.D.'s daycare facility, and visited with K.D. to "talk with her about what she likes to do, how she gets along with the other siblings in the household, if she likes it there, just everything." Foster Mother's "very nice" home is "out in the country." K.D. calls Foster Mother and her husband Mom and Dad, and Dempsey testified that K.D. has a "good relationship" with both. Although they "don't have a lot in common," K.D. and the three older boys living in the home appear to like each other. Foster Mother agreed, testifying that her sons, aged 12, 14, and 16, get along "about as well as teenagers can get along with a four-year-old," "really better than I even expected they would be with a little one," and K.D. loves them "very, very much."

Foster Mother testified she has a college degree in dental hygiene and works as a dental hygienist. Her husband works at his family's business and also as a youth pastor. She has known K.D.'s family for seven or eight years, since her mother married Grandfather. Foster Mother and

her husband own their own five-bedroom home, so "everybody has their own room." The family has lived in their current home for about seven years. Foster Mother testified that she and K.D. play together, and K.D. "just wants to do everything I do, girl stuff." She explained that because her husband is a youth pastor, "we're at church stuff all the time" with the children. K.D. started gymnastics, likes to play in the yard, and likes to sing "all the time," making up her own songs. She described K.D.'s development in her home:

> She speaks much clearer, she has—I think she's gotten more confident, like where she isn't clinging on to people as much, where she'll play independent. She'll—I mean, she was on a pacifier and a bottle and diapers and I got her weaned off of all that and she just—she's grown up a lot. And she's—I think she's gotten more confident and matured quite a bit.

And Foster Mother described the family's home life: "we're just pretty normal people. I mean we—we're just a normal family. We go to ball games, we eat dinner together, we—I don't know. I'd just say normal." She testified that she would like to adopt K.D., and would give K.D. the same opportunities her boys have growing up. As Mother points out, Foster Mother did not detail what those opportunities would be, other than playing sports and participating in family activities. But neither did Mother tell the jury any of her own hopes or plans for K.D.

Mother testified that she has obtained part-time employment and a residence suitable for K.D. Dempsey admitted that no one from CASA had visited Mother's most recent residence. Dempsey testified that she tried to visit Mother at one of her prior residences, a trailer home in Celeste, but Mother "was evicted before we could get there." Mother also testified that Aunt is helping her financially because her current pay is insufficient to cover her living expenses. But Aunt did not testify and Mother did not offer any evidence of any longer-term plan for K.D.'s support. Instead, Mother testified that she was "just trying to get through" trial. And Mother conceded that she had not contributed anything to K.D.'s support during the pendency of the case.

Grandfather testified about the changes he has observed in K.D. since she was removed from Mother's care:

Q. And you've had an opportunity to visit with [K.D.] since she has been placed with [Foster Mother]; is that correct?

A. Absolutely, yes.

Q. Okay. Could you tell the Jury the difference in how [K.D.] is now in that environment versus how she was in the environment provided for by her mother.

A. She was very quiet, withdrawn, like I said, she was basically just in diapers. She was still in diapers, she was still wearing a pacifier wrapped around her neck. And like I said, she was terrified at night. She would wake up screaming several times during the night.

Give an example they—she was back to visit a couple months ago and I looked out there and we had a storm cellar put in, we had a mound of dirt, and she's standing on that mound of dirt and she's singing the song from ["Frozen."] I mean, you— you know, and that tells it. She's—she's started gymnastics, she's doing great in those, she's a very athletic child. She's going to be great in anything she wants to do. She—her—

Q. Would—would you—would it be—would you characterize that the reasons for her issues when she first came into care were solely because her mother didn't have a lot of money?

A. No. Money has nothing to do with love and—and being a caregiver.

Q. It was the quality of care that—or—that she wasn't receiving.

A. Yes.

Q. Versus what she's getting now.

A. And moving from house to house, trailer to trailer, wherever [Mother] was living, living in a car . . . . You know, it just—none of it made any sense to us. We'd never—she was never brought up this way. You know, it just—how can you just not go get a job and support your child. How can you not do these things and you can't do them if you're on drugs. And it's everybody's fault but hers and she's never accepted the blame that she is a drug user. Sorry. I didn't meant to rant.

Q. Oh, no, sir. I think you expressed yourself quite well. So [Mother's] not been what you would call a good mother.

A. No, she has not.

Q. And do you know what [K.D.] refers to [Foster Mother] and her husband as?

A. Mom and dad.

The jury heard evidence that K.D. is doing well in a stable placement, a factor we have considered in determining the best interest of a child. *See In Interest of K.B.*, No. 05-17-00428-CV, 2017 WL 4081815, at *5 (Tex. App.—Dallas Sept. 15, 2017, no pet.) (mem. op.). There was evidence that K.D.'s emotional and physical needs were not being met while she was in Mother's care, as Grandfather testified and as we discuss in more detail below. While Mother provided evidence of recent improvement in her living situation and the home she can provide for K.D., she had not obtained employment through which she could sustain the improvements in the future, and did not articulate any plan to do so, testifying only that she was trying to get through the two days of trial. And "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Further, the jury was not required to believe Mother's testimony that she has been drug-free since January 2017 in the face of Mother's admission that her hair-follicle drug tests showed increasing levels of methamphetamine throughout 2017. *See id.* (fact finder, not appellate court, is sole arbiter of witnesses' credibility and demeanor).

We conclude the second, fourth, sixth, and seventh *Holley* factors weigh in favor of termination of Mother's parental rights.

***Programs available to assist individuals seeking custody to promote child's best interest***

Dempsey testified that although Mother has had an opportunity to avail herself of services to improve her parenting situation, she has not taken advantage of them. Based on this failure, Dempsey testified she did not believe Mother would take advantage of services and opportunities in the future. Mother admitted that she had refused a pastor's offer to assist her in admission to a shelter, testifying that she "had a home" at that time with an ex-boyfriend in a trailer without water or electricity.

–13–

Mother offered evidence that she attended a substance abuse program and a parenting course in compliance with the trial court's orders. But Mother did not testify to any programs she intended to rely on in caring for K.D.

We conclude this factor weighs in favor of termination of Mother's parental rights.

***Current and future emotional and physical danger to the child***

Melayna Townsend-Falck, the CASA volunteer assigned to K.D., testified that when K.D. was first placed with Grandfather and Step-Grandmother, K.D. was "acting out more," having tantrums, and self-harming by picking at her skin until it bled. But K.D. "adjusted pretty quickly" to living with Grandfather and Step-Grandmother. Townsend-Falck described a "really big difference" in K.D.:

> She was speaking more, she—a lot more when—when I—specifically the first visit, when I first met her and the second one, she was very cautious. It wasn't until about the 3rd—the 3rd to 4th visit that she was actually bringing me her sticker book and wanting to show me her room and all her toys, wanted to go show me the dogs outside, the blackberries. She was more—she didn't want to just sit there, she wanted to actually do things. She was—was not shy with pretty much anybody.

Townsend-Falck also testified that in her placement with Foster Mother, K.D. had "a loving home" and "many opportunities." She explained that K.D. did not have the same opportunities with Mother, because Mother's positive drug tests showed she was still using drugs, could not provide a stable home environment, and did not have enough income to support K.D. Townsend-Falck testified that Mother failed drug tests throughout the case, and the drug levels shown in the tests increased over time. Mother's explanation at the court hearings in which this was discussed was that "her hair wasn't growing." Based on her experience and training as a CASA volunteer, Townsend-Falck knew of no other reason why a person's drug test levels would increase other than because the person was using drugs. She testified that it is common among addicts to fail to take responsibility or admit their drug use, and she believed that Mother's conduct during the case, including her denial of drug use and her failure to obtain and keep employment, a stable residence,

–14–

and stable transportation, were all indicative of Mother's continued drug use. She testified that in most cases a parent is given a year after a child is removed from the parent's care to achieve the goals set by the Department for the child's return, but in this case Mother was given additional time to do so. We conclude that Townsend-Falck's testimony was based on her experience and training and on the time she spent observing and interacting with K.D., and was not conclusory.

A pattern of illegal drug use suggests Mother was not willing and able to provide K.D. with a safe environment. *See In Interest of K.B.*, 2017 WL 4081815, at *5. Past and ongoing drug use weighs in favor of the conclusion that termination of parental rights is in a child's best interest. *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see also In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) ("[I]t is proper to measure a parent's future conduct by his or her past conduct to determine whether termination is in the child's best interest.").

Foster Mother testified that "any child that's gone through life events that are this major," including termination of a parent, will have trauma, but for K.D., "the traumatic events have already happened and at this point I think it'd be traumatic to take her from us again—to take her away from her mom and dad now" and return her to Mother. She explained that two of her three sons are adopted through foster care "and I am well educated in the trauma of adoption." Mother admitted that her weekly visits with K.D. were canceled in May 2017 because of a positive drug screen, and she has seen K.D. only once since then.

Grandfather also testified that when he and his wife took over K.D.'s care, "sometimes she was like an animal, especially around me. For some reason she would scream and back away from me like a wild animal would. And she would wake up in the middle of the night screaming." He explained that they kept her cot next to their bed for the first few months she lived with them "so that we could get to her quick enough." In time, "we got her through that,"

and now she has just blossomed. She's singing in the church. She's just—she's doing everything. She's taking gymnastics. This kid has just come out [of] it. And, yes, she's happy. She's where she needs to be in life.

We conclude the third *Holley* factor weighs in favor of termination of Mother's parental rights.

### Parent's acts or omissions indicating that existing parent-child relationship is not a proper one
### Any excuse for the parent's acts and omissions

Grandfather testified that Mother lived with him while she was pregnant with K.D. He explained that Mother refused to work, and instead "spent most of her pregnancy laying on our sofa." Mother "wouldn't do anything. She wouldn't go to work." The relationship soured to the point where Mother moved to Georgia to stay with relatives for the remainder of her pregnancy.

When K.D. was about six months old, she and Mother moved back to Texas. They lived with a friend of Mother's until "that friend threw her out for using drugs in her garage," according to Grandfather. From time to time, Mother and K.D. moved in with Grandfather and Step-Grandmother, and during those times, Grandfather and Step-Grandmother took care of K.D. because Mother "liked to sleep." Grandfather testified that Mother would "grab a bottle and stick it in [K.D.'s] mouth because she didn't want to deal with [K.D.]." After Mother and K.D. moved out, Grandfather would see them infrequently, but he testified that on one visit, K.D. had a burn on her face. Grandfather testified that Mother "said it was from a trampoline. And somebody's cigarette is what it was."

Grandfather also testified:

A. . . . When I thought [Mother] was doing well and was going to turn her life around, I gave her money, I gave her tools, I gave her equipment to help her, to do—to accomplish, get a house and fix it up the right way and everything. I did all of that. And then next thing she goes for another hair follicle test and she failed it. And that was the last contact I had with her. I had no need for it—I just couldn't go through it again.

He explained that the tools and equipment he provided were to help Mother fix up a house in Celeste, but when he visited the house, its condition was such that he "told [Mother] to vacate

it and go find something else to live in," because it did not appear appropriate for K.D. at any point. Grandfather testified that even if Mother had passed the drug test in May 2017, "[t]here were still—still a lot of things she needed to do and one of them is get rid of the two houseguests that she had living with her. And so, again, she makes terrible choices in men."

When shown photos of the apartment Mother rented at the time of trial with money supplied by Aunt, Grandfather said,

> My concern would not be with the apartment you showed me but, also, that it is a temporary thing. I mean, this something that was given to her by her aunt in Georgia, the money to rent this place, and once the aunt—her money runs out, she's going to be back on the street again. She has no job. She has never worked. She hasn't worked in 15 years.

Grandfather explained that Mother worked for one week at a hotel, but then quit, saying her paycheck was "too small and she's not going to waste her time." And although Mother registered at cosmetology school, and Grandfather both loaned Mother a car to use to go to the school and provided child care for K.D. during class time, Mother "only went for a short period of time until she got her first check from the government and then stopped."

Mother did not offer excuses for her past drug use, although she attributed her drug test failures to her hair's slow growth. She testified that lack of reliable transportation had prevented her from attending all of the treatment and counseling that was required after K.D.'s removal, and she admitted that she had forgotten to attend domestic violence situation counseling as she was ordered to do. She also testified to setbacks in her efforts to obtain stable employment and a stable living situation from the two fires in places where she was residing. In two letters introduced into evidence at trial, Mother blamed Grandfather for her problems. And she admitted that she was ordered to take another drug test a few days before trial, but did not do so. She testified that "my car was broken down so . . . I called and then I went into them and they said that they no longer do CPS testing and I tried to get in touch with [a CPS worker] but she was on vacation and her

voicemail was not set up so I couldn't—couldn't text her." The jury could reasonably infer that Mother avoided taking the drug test because she was using drugs. *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.). Further, the jury could have found Mother's excuses and attempts to place blame on others for her drug problems and her lack of contact with K.D. not credible. *See In re J.O.A.*, 283 S.W.3d at 346 (jury is sole arbiter of witnesses' credibility).

We conclude the eighth and ninth *Holley* factors weigh in favor of termination of Mother's parental rights.

## CONCLUSION

Based on the evidence presented at trial, we conclude that the jury could have reasonably formed a firm belief or conviction that it was in K.D.'s best interest for Mother's parental rights to be terminated, and that Mother committed conduct in violation of section 161.001(b)(1)(D), (E), (O), or (P) of the family code. Consequently, we conclude that the evidence is legally and factually sufficient to support the trial court's judgment, and we resolve Mother's sole issue against her. We affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

180849F.P05

–18–



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF K.D., A CHILD

No. 05-18-00849-CV

On Appeal from the 354th Judicial District
Court, Hunt County, Texas
Trial Court Cause No. 84,309.
Opinion delivered by Justice Lang-Miers;
Justices Evans and Schenck, participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 27th day of November, 2018.