# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-22-00054-CV

---

**J. S., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
NO. 200022CPS, THE HONORABLE GARY L. BANKS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

J.S. ("Father") appeals from the trial court's order terminating his parental rights to his sons, "Andrew," born in June 2018, and "Bruce," born in July 2019, signed after a jury found that termination was in the children's best interest and that Father had endangered the children, constructively abandoned them, and failed to comply with a court order setting out actions necessary to regain custody.[1] *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O), (2). We affirm the trial court's order.

### FACTUAL AND PROCEDURAL SUMMARY

On January 27, 2020, the Texas Department of Family and Protective Services filed a petition seeking conservatorship of the children, attaching an affidavit by investigator

---

[1] For the children's privacy, we will refer to them and their family members by aliases or their relationships to the children. *See* Tex. R. App. P. 9.8.

1

Brandy Walker explaining that the Department had received referrals about the family in 2018 and 2019 but had closed the cases as "unable to complete" (UTC) because it could not locate the family to investigate. In December 2019, the Department learned that Father had been arrested. Investigators spoke to Father in jail on two separate occasions, but he refused to cooperate or give any information about the children or Mother's whereabouts.

According to the affidavit, on January 24, 2020, Father found Mother unresponsive and called an ambulance; Mother was pronounced dead at the hospital. The Department was called, and Walker responded, finding the children at the scene with Father and some relatives. Father told Walker that he knew that the Department had been trying to find the family and that the children had been reported on the Child Safety Alert System. He told Walker that the children "had not been seen for any well check-ups by a Pediatrician due to the fact that he and the mother feared the Department would remove the children." Walker averred that the Department was concerned because the children had been on the Child Safety Alert System for about a year; the parents "had been uncooperative in several prior cases where the investigation[s] were unable to be completed to ensure the safety of the children"; Mother was deceased, her cause of her death was unknown, and she had a history of allegations of drug use; Father had just been released from jail and [was] unable to provide a safe environment for the children; and the children had "not been seen by a physician to ensure that they are healthy."[2]

---

[2] Although Walker's removal affidavit also stated that the boys were dressed appropriately but very dirty, Walker conceded at trial that the boys did not appear to be particularly dirty in a photo taken at the scene of Mother's death. She testified that she included that information in her removal affidavit because "when we went to the foster home and they were getting them ready for a bath, their feet, they were dirty." Their clothing, although it "wasn't terrible," was dirty enough that Walker got them new clothes from the office.

After the Department was appointed temporary managing conservatorship, Father had several successful in-person visits, but after visitation shifted to virtual visits in late March 2020 because of the pandemic, he attended only one virtual visit. The trial took place before a jury over several days in November 2021.

Department Special Investigator Eric Sanders testified at trial that he got involved in July 2018 because the Department had concerns about parental drug use and domestic violence but had been unable to locate the family to investigate. Sanders found Father, but not Mother or the children, and Father told Sanders that Mother was "quite paranoid" about the Department and was afraid they would take Andrew away. Father was cooperative "[t]o a degree" but claimed he did not know where Mother and Andrew were. He also said, "They're not far away," and gave a possible location, but Sanders did not find Mother after following that lead. Father later texted Sanders another location, saying that Mother "was at the location using drugs, being methamphetamines, and syringes were involved," but when Department personnel went to the address, Mother and Andrew were not there. After more unsuccessful efforts to locate the child, the Department put a Child Safety Check Alert List (CSCAL) into place.[3]

In July 2019, law enforcement in Tom Green County "laid eyes on mother and child and saw no immediate danger." Another contact in Granbury indicated "no emergency or danger to the child." However, the original CSCAL or another, later-placed CSCAL remained in place. In December 2019, Sanders met with Father, who was in the Tom Green County Jail for several weeks. Father said he did not know where Mother and the children were and asked

---

[3] When a CSCAL is issued, all the "known information" for the parents and children—"name, information, vehicle information, last address," "weight, age, tattoos"—is input into the state-wide program, and if a law enforcement officer runs anything that matches that information, an alert is sent to the officer or to the local law enforcement dispatch letting them know that "[a] child that needs to be checked may be in danger."

Sanders to help him locate the family. Father was released from jail on January 21, 2020, at which point he found Mother and the children.

On January 24, San Angelo police responded to a call about a reported death at a mobile home. Father, the children, his mother (Grandmother), and his sister (Aunt) were on the scene. Father was trying to take care of the children despite being in shock, and he got the children clothed and fed. Detective Kenneth Dye testified that the family was staying in a "small travel trailer" that "did not appear to be furnished." There was a small sleeping area with "dirty dishes, old food and things scattered around throughout the trailer," and "[i]t was more set up for an individual as opposed to a family." Father told Dye that he had recently been released from jail and that the family "didn't have a permanent place to stay at that time and had been kind of moving around. They had been allowed to stay in the trailer."

Inside the trailer, in a bag containing Mother's identification and personal belongings, law enforcement found scales and "a glass pipe that had white residue, as well as a syringe." Dye believed that the pipe was used to smoke "a narcotic, whether it be methamphetamines or some other type of amphetamine." The syringe, he testified, "is indicative of drug use; methamphetamines, amphetamine, heroin." Father initially denied drug use but later admitted to Dye that he and Mother "had been using methamphetamines since he was released from jail." Father had called for emergency personnel for Mother when he came inside from working on a vehicle to find her unresponsive.

Upon her death, Mother was "unkempt," appeared to have "worn her clothes for a couple days," and had an apparent injection mark in her arm. Her autopsy indicated that she was about twelve weeks pregnant, suffered from "a hypertensive condition," and died from "an accidental overdose, with the cause being the acute methamphetamine intoxication."

4

Investigator Brandy Walker testified that she responded to a report stating that Mother had died, that two children under the age of two were present, that the Department "had been looking for them," and that the family had at least three prior UTC cases. When she arrived, she saw the children with Father, Grandmother, and Aunt. Father told Walker that he had recently gotten out of jail, did not have a residence of his own, did not have a vehicle, and did not have a job or the means to care for the children. Walker asked about Father's lack of cooperation with the Department in the past, and he said that he "wasn't exactly sure where the children were, that when he was released, he did have to locate them himself."

Walker testified that she wanted to "get the kids away from that scene" and that she asked Father for permission to transport the children to the Department's office, explaining that if Father had not consented, she could have asked a law-enforcement officer to transport the children. Walker drove the children to her office, where there was "an area where they would be more comfortable, they can play, things like that. So, that's the purpose of transporting them back to the office while we, you know, see what we need to do next."

Walker testified that she discussed placement options with Grandmother and Aunt, who both passed initial background checks and expressed willingness to take the boys, and advised them "that if the Department takes custody of the children and placed them in their home, that per the Department, we don't typically allow the parents to live there." Grandmother and Aunt discussed whether they could take the children and ultimately declined to take custody of the children. Grandmother told Walker that she was already caring for Father's older child and "did not want to disrupt his life with this because he had no knowledge he even had brothers." She and Aunt decided they would rather support Father "to help him get on his feet" and to support him while he did "the work and the services to get his children back." Walker did

5

not think Father had come to her office the day the children were removed and said there "wouldn't have been a reason he wasn't allowed to, but I know that he was speaking with detectives." She did not give Father "a reason for removal out at the scene" because she "didn't know enough to make that determination." Walker took the boys into Department care due to concerns about their safety because of: "prior intakes with concern of drug use of the parents"; Mother's death and concerns about whether her death was related to drug use; earlier UTC cases that led Walker "to believe that the family probably would not be cooperative"; the family did not have a stable situation; the children had not been for well-checks; and the children were young and thus "extremely vulnerable, not really verbal to be able to express that anything is happening to them or if they're being mistreated or abused."

Christopher Mitchell, the children's Court Appointed Special Advocate (CASA) and guardian ad litem since January 2021, testified that he had reviewed the boys' records and spoken to the boys, Father, the foster parents, and other individuals. Mitchell spoke to Father in January 2021. In that conversation, which "was the only real interaction" Mitchell had with Father, Father informed Mitchell that he was not visiting the children because he "believe[d] it impacted them, or it was somehow detrimental to their development." Father also said that he "was not engaging in some of the services because he believed that the children were taken wrongly, and he did not need to do so." Since that time, Mitchell had called Father four or five times and texted him six or seven times, trying "to reach out monthly" to give Father updates on the children and their development, "letting him know, 'I'm still involved with the case. If you have a moment to talk to me, I would love to hear your perspective on the case, whether it's what happened in January or what you're doing now, in terms of trying to get to reunification.'"

6

Father had only sent one text message "just reiterating his prior decision, which was: 'If you want to know what's going on in the case, look back at January 24th when the boys were taken without authority.' That's the only other time I heard from him." Father never answered Mitchell's inquiries into whether he was engaged in services, "other than to make clear that he believed that the whole process was kind of invalid because of the way that [the children] were taken." Mitchell believed that Father had "made a decision that he doesn't want to interact with CASA at all" and that he had made the same decision with regards to the Department. Because of that decision, Mitchell had not been able to assess whether Father is "able to create a safe and stable environment" for the children. Mitchell did not know what steps Father had taken toward reunification, whether Father had a house or employment, whether there were drugs in Father's home, or whether Father is "under the influence of drugs when he's around the children," saying, "Those are still concerns that I still, sitting before you today, cannot answer." Father had not provided an address or allowed CASA to visit to see if his residence was safe and secure, and he had failed to take random drug tests. Mitchell also noted that his review of the children's medical records indicated that before coming into foster care, Andrew and Bruce "were not getting any medical care or treatment to identify any concerns that could have arisen or any medical needs of the children." Mitchell was therefore "unable to ensure that [Father is] able to provide a safe environment for the boys," and he said that "the fact that [Father] was, once the boys were taken, unwilling to continue to ensure that there were no drugs in the home, that obviously is a big concern." Further, Father had never visited the boys during the time Mitchell had been involved, and although Mitchell acknowledged that it might take some time to "get integrated into the boys' life," he believed that Father "has not shown any interest or, from my perspective, desire to reintegrate with the boys."

7

Mitchell acknowledged that CASA had agreed with the Department's decision to seek termination from early on but said that "if [Father] were to have started to engage or take drug tests or things, I think absolutely our recommendation could have changed if that was in the best interest of the children. It didn't." Asked when he decided that termination of Father's rights was in the boys' best interest, Mitchell answered:

> I think it became apparent probably late summer of this year when I continued to reach out to [Father] via attempted calls or text messages. I started providing him updates on the children and how they were doing. I didn't get any response to that. It seemed, from my perspective, that for [Father], this case ended when the boys were taken. That's how I feel he views it, because his complete focus on the case is what happened the day the boys were taken. So, my concern was that he was not engaged in attempting to reunify with the boys or visit with the boys or to take the steps necessary to get to the point where he could start seeing them. So, I believe it became clear to me towards the end of the summer, maybe August, or the end of July of this year.

Mitchell testified that Father's text, "coupled with the fact that he was not willing to engage with us and that he wasn't making any attempted efforts to meet with or see the boys, I think that really solidified my decision, based on top of the evidence that I had previously reviewed."

Mitchell said that the foster mother "seemed very involved" with the children and their needs. The foster home was "very safe, kid friendly, and an environment where they could thrive." He had no concerns about the safety of the home and testified that the children "interacted very well" with the foster parents' adopted son, who is close to Andrew's age, and "absolutely" considered him to be their brother. The three children "interact like brothers" and "would always be interacting, playing with toys together"—"it was always very clear that they were a pack together, that they were brothers for all intents and purposes." Mitchell also testified that the boys were "very well connected" to the foster family, "view the foster parents as Mom

8

and Dad," and turn to the foster parents for love and affection and to help them with problems. Mitchell believed that the foster parents had met all the children's needs and testified that "it's been amazing to watch them over the last year to see how they have been able to develop and hit those age-appropriate milestones." He had seen the children interact with the foster parents' extended family and testified that the grandparents "absolutely viewed [the boys] as grandchildren." Mitchell believed that it was in Andrew's and Bruce's best interest for Father's rights to be terminated so that they can be adopted by their foster parents.

Department caseworker Sierra Perez was assigned to the case in about June 2020. She testified that the children were brought into the Department's care because of "concerns of drug use and concerns that the children were left with their mother while she passed away from a drug overdose." Perez talked about Father's family safety plan and the services he was required to undertake and testified that she made a counseling referral in June or July 2020 and then had to make a second referral in May 2021 because the first expired after the counselor "was not able to get in touch with" Father. She also gave Father the contact information and address for a substance-abuse assessment provider in July 2020 and gave him referrals for that assessment in February 2021 and May 2021.[4] She gave Father referrals for the provider who would be monitoring his visits in July 2020 and January 2021. As of August 2021, Perez would be monitoring visits, so she asked Father for his availability but never received a response.

Perez testified that Father attended three in-person visits in February 2020, which went well, and that he missed at least one visit in March. In late March or early April, visitations changed to virtual visits because of the pandemic. The Department tried to set virtual visits in

_____

[4] Perez testified that it was not necessary to provide a referral for a substance-abuse assessment until 2021 and that "no paperwork that I was aware of" was necessary to obtain an assessment in June or July 2020.

April but could not contact Father—"He just wasn't able to be reached." In Father's first virtual visit in May, Andrew started crying, and Perez testified that she could not say why he was crying but that it appeared "that he was crying because he couldn't hold the phone." She also testified that because the children are so young, they "were not verbal" and "there's not much they can talk about." Father had not had any visits since then, and Perez explained that when a parent "misses three visits back to back, we remove them from the visitation schedule, and they would have to request visitation again to get back on the schedule." Perez testified that Father "never expressed to the Department that he elected not to participate in" virtual visits and only "much later on," in late 2020, did he ask for a counselor or psychiatrist to help facilitate visits.

In-person visits resumed in June 2020, but Father had been removed from the visitation list after missing three consecutive visits. According to Perez, to get back onto the schedule, Father would have had to "make contact with" the Department to discuss his availability and any transportation needs, which would then allow the Department to facilitate visits. However, although Father had requested visitation several times, he never also provided his availability. He also "demanded that we get a psychiatrist involved," a request that the trial court denied, and Perez said, "We typically don't have psychiatrists involved in visits . . . . And there was no need to have a psychiatrist during those visits."

Perez testified that Father would have been able to have about eighty visits if the visitation schedule had not been interrupted. Perez said that she was never aware of any barriers, including transportation or electronic problems, that would have prevented Father from having visitations, and agreed that it was "essentially within his control whether he had a visit or not." Father had not provided the children's caregivers with any supplies, and Perez believed that he had "essentially abandoned" the boys.

10

Perez also testified that she made monthly efforts to contact Father, "either by phone, text message, email, or doing unannounced visits to possible residences," but that she had "had very minimal communication" in the form of two phone calls and two emails. She had not been able to inspect any of Father's residences because he had never provided accurate addresses, and she did not know whether Father was using illegal substances because he "would not drug test for the Department." In July 2020, he said he "needed advance notice" of drug-test requests, but Perez "declined that request because these tests are meant to be random."

Perez said that Andrew and Bruce were bonded to their foster family: "Whenever I visited with the children at the home, they play with the foster family, just as though they're playing with their mom and dad. They play with [their foster brother], just as if they had been playing with their brother." The home meets all of the boys' needs, and they "are always happy and playful" and are "happy and healthy in that home." Perez believed it would endanger the children if they were returned to Father's care because the boys are "under five years old. They are vulnerable. They are non-verbal. They can't self-protect. The Department has not been able to assess [Father's] lifestyle, his sobriety, his financial stability. We have not been able to assess if [Father] can provide the children with a safe, stable, drug-free home." The Department was seeking termination so Andrew and Bruce are "able to obtain permanency and to be freed up to be adopted by the [foster family]." She said the foster parents "have been the parents to [Andrew] and [Bruce] since January of 2020."

In 2021, Perez contacted Grandmother and Aunt to ask if either had changed their minds about being a placement for the children, but both again declined. Grandmother "wasn't receiving much help" from Father for caring for Father's older child, Father had been "verbally aggressive to her," Father had blamed her and Aunt "for the children being in CPS care, and she

11

really just didn't want to have much more to do with him." Although cousins who live in Oklahoma had contacted Perez in April 2021 and were approved as a foster home in October 2021, the Department did not recommend that placement because the cousin and his fiancé "are essentially strangers to the children," and the children "have created a family" with the foster family and removing them "would essentially cause them more trauma."

Aunt testified that on the day of Mother's death, she and Grandmother were planning to take the boys to Grandmother's house while "all of this kind of got sorted out," but Walker told them that they "were not allowed to do that" because of the CSCAL. Walker asked if Grandmother or Aunt would take the children but gave no time frame and indicated that Father would not be "allowed to be at the same house where the kids were at" until the case concluded, and Aunt said she had been willing to take the children for about a week but could not agree to an indefinite amount of time. Father lived with her for a while after the children were removed, and the Department came to pick him up for visitations every week for three or four weeks. Aunt believed that Father could care for Andrew and Bruce: "It would be very difficult for him, but I think he knows that and understands that, and he would do anything for these two little boys." Aunt testified that "[i]f [Father] were to have a permanent home," Grandmother's home is "the closest thing" that he has to one. She did not know where Father and the boys would live and said, "You would have to ask him." She thought he was working but did not know how long he had held that job, and she did not know when he last slept at Grandmother's house.

The children's foster mother testified about how bonded the family is; how the boys get along with her adopted son, who is close to Andrew's age; how well the boys have done in the home; the family's routine and extended family; and their developmental progress. Foster father and his father, the children's foster grandfather, testified similarly, explaining that the

12

children had grown to feel safe and secure in the home and that they were thriving, developing well, bonded to the family, happy, and healthy. The foster mother described the first and only virtual visit, explaining that Andrew had been holding the phone and walking around while she answered Father's questions about the children. However, Andrew was mostly only showing his forehead to Father, so she took the phone to try to let Father see both boys, which made Andrew upset. She observed that most two-year-olds respond similarly when a phone is taken away.

The foster mother said that in the early weeks, when Father had in-person visits, "we were kind of excited for them, like, this guy's gone through a lot, and he's showing his effort and doing these things. And then the tides just kind of turned, and everything just kind of completely fell off, and it's continued to remain that way." She believed that termination of Father's rights was in the boys' best interest. Asked if arrangements could be made for Father to be "still in the boys' lives but they lived with you," she answered, "I think at this particular point, legally, we would desire to have full custody of them. As for further arrangements, I think that's just something [foster father] and I would have to discuss and look at, you know, where the boys are at and their understanding of where [Father] is at, and what is going on in his life as well."

Father testified that he met Mother in 2015 and that they were common-law married. Father admitted to two charges of evading arrest and testified that he had a pending motion to revoke for one of those charges. He also said that he had been charged with: possession of marijuana in 2020, driving with a suspended license, possession of methamphetamine in 2013, criminal mischief, resisting arrest, driving while intoxicated from when he was seventeen, "Minor in Possession back when I was a kid," and several other charges that he said had been dismissed. He testified that he spent four months in a state jail for the methamphetamine charge and "had two months of back time here," and stated that, although one

13

of the documents introduced into evidence stated that Father "did 180 days in the county jail for that charge [of evading arrest], but that's not true."

Father started drinking and using marijuana when he was fifteen or sixteen, started using methamphetamine when he was eighteen or nineteen, and did a thirty-day in-patient drug rehabilitation program in the early 2000s. He testified that his methamphetamine use was "a recreational thing on the weekends" and "kind of sporadic," that he had used it with Mother, and that he last used it in January 2020. He insisted that he and Mother "didn't do drugs around our children, in the presence of our children," and that they only used methamphetamine when the children were asleep, testifying that "if a parent is intoxicated to the point that they can't take care of their children, I would say, yes, that's probably bad."

Father testified that Mother got prenatal care when she was pregnant with the children, although he admitted that she "didn't have adequate prenatal care." Both boys "were born with no problems, born full-term, healthy baby boys," he said, and Mother "was drug-free both of the pregnancies." Father said, "I can't testify to that," when asked whether Andrew had one-week or one-month checkups and said that he doubted that Mother brought Andrew for his one-year checkup. He knew that Andrew "had not been vaccinated because of [Mother's] fear of the Department taking her children from her," but insisted that he never told the Department that the child received "no medical care." He did not know what kind of care Bruce had received but testified that he never took Bruce to "any follow-up medical checkups."

Father was arrested in mid-December 2019 on a motion to revoke his probation from a charge of evading arrest. While he was in jail, a friend allowed Mother and the children to live on property Father had sold to him. Someone from the Department visited Father in jail,

14

explaining that there was a CSCAL on the children and that the Department needed to see the children and make sure they were okay, but Father

> told them that while I was in jail, I wasn't going to give up my wife and my kids to them, that we had already been seen, that there's nothing wrong with my children, and I wasn't going to give them any locating information. And I also told them, too, that I don't know where she's at.

Father did not want to help the Department find Mother and the children because he "felt they were vulnerable, and that the system—CPS, as a system, was gunning for my children." He thought that nothing he and Mother did would make the Department take the family off the CSCAL, and Mother felt the same—"She knew that CPS was going to take her children from her, and she would not let that happen."

Father was released on January 21, 2021. Once he reunited with his family, the friend with whom Mother had been staying "didn't want us all staying there together," so Father found another friend who allowed the family to stay on his property. Father admitted that he smoked methamphetamine the night he got out of jail but denied telling law enforcement that he "had used methamphetamines in the days leading up to the death of" Mother. He also admitted that he and Mother had smoked methamphetamine together and that he had violated the terms of his probation by using drugs and by failing to complete community service. On the day Mother died, Father had gone outside to work on a truck. When he came inside, he realized that Mother was unresponsive, "her hands were clinched real tight," and her eyes were glazed over, so he started CPR and called 911. The children were present and Andrew was just waking up, so Father asked his friend to take Andrew out of the trailer "because he didn't need to see what was happening." Emergency services transported Mother to the hospital, where she was pronounced

15

dead. Mother's autopsy indicated that she died of acute methamphetamine intoxication, but Father disputed that, saying that was what "the death certificate said, but that's not true." Mother was pregnant when she died, and Father testified that she "also suffered from preeclampsia" and "had cancer" and "underlying conditions as well."

Father denied that he had agreed to the children being taken into Department care by Walker on the day of Mother's death. He insisted that he never gave Walker consent to take the children, that she never asked for his consent, and that he was "strongly against" her taking the children. Father also testified that he told Walker that she could not take the boys because "she doesn't have the grounds to take my children" and that Walker placed them in her vehicle while Father was talking to law enforcement. Aunt stopped him from going to Walker's car and told him he was not allowed to go to Walker's office. Father called the Department "that night, asking where my kids were." He was told to go to the office on Monday morning, and when he arrived, he was told that the Department had filed its removal affidavit and petition, asserting neglectful supervision and physical neglect "due to a lot of unable to completes" after allegations of possible drug use and domestic violence.[5] Father asked where the children were and whether they were okay, expressing concern because they had "just lost their mom," and Walker said they were with a foster family and doing well. Walker told him that Grandmother thought it would "work better" for the children to be placed in a safe place while she focused on supporting Father so he could regain custody.

Father testified that he had been living in his current residence for two to three months, that he had lived at his previous address for three to four months, and that he had "had a few [addresses] since the case started." Father testified that there had been "zero contact

---

[5] A recording of a portion of this conversation was introduced into evidence.

between me and the caseworkers" and that many of the drug-test requests referenced by the Department in its questioning of him were "impossible because there's no contact between us." He said, "So, all of these dates that you're popping off, there's no way that I was asked to drug test on all those dates because there's no communication hardly." Father insisted that he had not been asked to create a Relapse Prevention Plan, to complete counseling, or to provide the Department with a "plan of child care in the event the children were returned." He later conceded that his family safety plan included the goals that he would "work with a counselor and participate in a substance abuse assessment to develop a treatment plan, as well as a relapse prevention" plan, but insisted that he was "never asked to go to a counselor" and was never given a referral for counseling. He said he never completed a drug and alcohol assessment because the service provider told him that the Department "failed to have the proper paperwork filed with them." Father completed parenting classes and had attended NA/AA meetings, although not twice weekly, and he said he had attended fewer meetings after the Department changed its goal to seek termination because "[i]t didn't matter what I did for the Department, they had already changed their plan." Father testified that he had "never once been asked to provide anything for these children" and that he had not brought them presents or cards for birthdays or holidays because "I was told not to have contact with my children like that. I cannot send them cards or take them presents or celebrate their birthdays or Christmas or any other holiday."

Father said that he attended all the possible in-person visits with his sons until visitations became virtual and that he was removed from the visitation list after one virtual visit because the visit "was very disruptive on my son." Father testified that he "requested for a psychologist or psychiatrist to be present because my last virtual visit went horribly wrong" but that no such assistance was provided. Therefore, he said, "I chose to not have contact with my

children after that visit." Father explained, "I made a conscious decision not to do that because of the way the last visit had gone," and said, "I took it upon myself and my children's best interest to not disrupt their lives like the last visit did. And you cannot have virtual visits with children that age. It's just not feasible, right?" Father said that the virtual visit "went bad," explaining that Andrew "had the phone for a second, and then the phone was taken away from him. And, so, he was kind of hysterically crying, or he was mad." Bruce then started crying, and "it was just a very dysfunctional visit with my children." Father thought the foster mother took the phone from Andrew "because she didn't want a toddler to have a phone" and because "he was wandering around with the phone." Seeing how the visit affected Andrew and because Bruce was too young to understand what was going on, Father "felt like it was in my children's best interest to stop that disruption, because if that's going to go on like that every week, . . . I just didn't think it would be good for" Andrew. He said:

> At the time, I requested a psychiatrist or a psychologist be involved because I found that in the Family Code. Today I stated that I decided to end those visits because of what had happened, how bad that it traumatized them. They're not visits when they're one and two years old, virtually. You can call it a virtual visit, but it's not a visit. He got on the phone long enough to see that his dad was on the phone, and then the phone was taken away from him. And, so, he started crying and throwing a fit. If you call that a healthy visit—I mean, I don't see how you can call it a virtual visit like that. It was virtual chaos, is what it was.

He said that after he decided against virtual visits, he was taken off the visitation list and "never offered any more visits after those virtual visits—or that virtual visit." He did not know when in-person visits resumed and said that "nobody from the Department told me anything about that." He conceded that he never asked about resuming visitations, saying, "No, I didn't,

because after a few months go by and they're bonding with the foster parents—I mean, do you really think I should disrupt their lives and their family?"

Father was asked what his plan was for the boys, and he said he did not "want them to go through the trauma again of losing their mother. So I'm not sure how we're going to resolve this at the end, but I do not want to take them away from" the foster parents. Father said that his criminal charges dated from before his children were born and, when asked if his being in jail endangered the boys, said, "If my children have somewhere to go and my family to stay with, I don't see how me going to jail would endanger my children." He testified that he did not know whether the men with whom Mother stayed while he was in jail had drug charges or other criminal history.

At the conclusion of trial, the jury found that Father had engaged in conduct that endangered the children or placed them with someone who engaged in such conduct; placed the boys in or allowed them to remain in conditions that endangered them; constructively abandoned his sons; and failed to comply with a court order establishing the steps necessary to regain custody. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O). The jury also found that termination of Father's rights was in the boys' best interest. The trial court then signed an order approving and incorporating the jury's findings and terminating Father's parental rights. On appeal, Father challenges the best-interest finding.

**STANDARD OF REVIEW**

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for

19

termination and that termination is in the child's best interest. *Id.* § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). In reviewing factual sufficiency, we weigh the evidence favoring the finding against disputed evidence and ask whether the evidence "a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* In reviewing the sufficiency of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the children's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the children, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the children's best interest, plans for the children's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive and need not all be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably

20

forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The children's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs. *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the children might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the children's best interest. *See L.R.*, 2018 WL 3059959, at *1.

## DISCUSSION

On appeal, Father contests the jury's finding that termination is in the children's best interest. He notes that Andrew and Bruce were healthy, well cared for, and born free of drugs and that they were removed "on the flimsiest of bases, basically because [Father] had limited financial resources, not because of actual imminent harm." He asserts that after the boys were removed, he received "poor guidance and cooperation from the Department," and that the switch to virtual visitation upset his children so much that "he ceased visits for their benefit," requesting but being denied psychological help for the boys. He argues that his use of methamphetamine was "outside the presence of the boys" and "hardly so serious as to warrant termination," that his "criminal history is modest and nonviolent," and that "[t]here is no evidence the boys were harmed or placed in harms' way" so as to justify termination. Finally, he

21

asserts that his desire and intention to put the children first is proven by his testimony that he does not want the children moved from the foster family's care.

The record shows that Mother died of methamphetamine overdose while in the trailer the family was staying in, with the boys present and asleep. Father admitted to drug use in the past and, although he denied being asked to drug test, the Department presented contrary evidence that he missed numerous tests while the case was pending, which the jury could have presumed would have resulted in positive results, *see J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 WL 5456653, at *6 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.), and it was for the jury to evaluate the credibility of the witnesses and determine the weight to be given their testimony, *see A.B.*, 437 S.W.3d at 503; *J.P.B.*, 180 S.W.3d at 573.

Moreover, Mitchell and Perez both testified that they tried to reach out to Father repeatedly throughout the case but got very little in the way of responses from him, and Mitchell thought that Father was more interested in contesting the propriety of the initial removal than in working with CASA or the Department to regain custody. According to their testimony, because of Father's lack of communication and cooperation, neither Perez nor Mitchell was ever able to assess whether his residence would be appropriate for young children or whether he would be able to provide his sons with stable support. Perez said that she provided multiple referrals for various services, but Father did not show that he followed through on them. In addition, Father acknowledged that Mother had not gotten the children medical care; he has a fairly length criminal history that, although it does not consist of violent offenses, has at times resulted in his incarceration and lack of contact with his children, and an extensive history of drug abuse; he did

not show that he had obtained stable employment; and he did not have a plan to provide the children with a stable, safe home in the future. *See, e.g.*, *In re S.M.L.D.*, 150 S.W.3d 754, 761 (Tex. App.—Amarillo 2004, no pet.)

Andrew and Bruce are thriving in their foster home, and that family hopes to adopt them, thus giving them permanence and stability in the future. The children are closely bonded to their foster family and consider the foster parents "Mom and Dad." Father, on the other hand, decided to stop virtual visitations after the first April 2020 virtual visit, in which Andrew started to cry when the phone was taken away and never provided the Department with information necessary to restart visitations. Because of his actions, therefore, he had no contact with his sons for almost half of Andrew's life and for the majority of Bruce's. On this record, we cannot conclude that the evidence is insufficient to support the jury's finding that termination of Father's parental rights is in the boys' best interest. *See Holley*, 544 S.W.2d at 71-72. We overrule Father's issue on appeal.

## CONCLUSION

We have overruled Father's sole issue on appeal. We therefore affirm the trial court's order of termination.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed: June 17, 2022

23